**Sheldon P. KOTTLE, Plaintiff–Appellant,**

v.

**NORTHWEST KIDNEY CENTERS, Defendant–Appellee.**

No. 96–36258.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 6, 1998.

Decided June 18, 1998.

Mark G. Olson, Everett, Washington, for the plaintiff-appellant.

Douglas C. Ross, Davis Wright Tremaine, LLP, Seattle, Washington, for the defendant-appellee.

Before: THOMPSON and TASHIMA, Circuit Judges, and STAGG, District Judge.*

* The Honorable Tom Stagg, Senior United States District Judge for the Western District of Louisi- ana, sitting by designation.

TASHIMA, Circuit Judge.

In this case we apply the *Noerr–Pennington* doctrine in the context of an administrative proceeding. Specifically, we must determine whether the scope of the "sham" exception is different in an administrative proceeding than in litigation.

## I. Background [1]

In 1979, the State of Washington enacted the Health Planning and Resource Development Act (the "Act"). RCW 70.38. The Act declares that it is the "public policy of this state" to engage in health planning and encourage both consumers and providers throughout the state to be involved so as to control "excessive increases in costs." RCW 70.38.015(1). The Act authorizes the Department of Health (the "Department") to administer a Certificate of Need ("CON") program to allocate health care resources. RCW 70.38.105(1). Under the CON program, the establishment of a new health care facility is subject to approval by the Department. RCW 70.38.105(4)(a). A kidney dialysis treatment center is such a health care facility subject to approval. WAC 246–310–010(18).

After receiving a CON application, the Department may conduct a public hearing. RCW 70.38.115(9). At the hearing, any person may appear and be represented by counsel and may present oral and written argument and evidence. An "affected" person may also appear and "conduct reasonable questioning of persons who make relevant factual allegations." WAC 246–310–180(5). Any health care facility that provides services similar to those sought to be provided by the applicant is considered an "affected person." WAC 246–310–010(2)(b). Following the hearing, the Department must issue written findings. WAC 246–310–490(1). An applicant who has been denied a CON has the right to appeal the Department's decision to an adjudicative proceeding governed by the Washington Administrative Procedure Act ("APA"). RCW 70.38.115(10); WAC 246–310–610.

Plaintiff-appellant Sheldon P. Kottle is a physician specializing in nephrology and transplant medicine. Kottle is the sole officer and shareholder of King County Kidney Center ("KCKC"). In 1991, Kottle filed CON applications with the Department seeking approval to build two kidney dialysis centers under the name KCKC. At that time, defendant Northwest Kidney Centers ("NWK") was the only provider of kidney dialysis services in King County. Perceiving Kottle to be a threat to its monopoly, NWK began a hostile campaign to prevent Kottle from establishing KCKC within NWK's market. NWK undermined Kottle's business negotiations and aggressively opposed Kottle's CON applications using methods and means which were improper and unlawful. NWK made false statements of fact and misrepresentations about Kottle and KCKC and encouraged others to do so. NWK's false statements and misrepresentations included the need for kidney dialysis services in King County. Influenced by NWK's statements, the Department rejected Kottle's CON applications on March 30, 1992.[2] At all times, NWK acted with the intent of eliminating competition and preserving its monopoly in the kidney dialysis market in King County. In 1995, NWK filed its own CON application for a similar dialysis facility at the same location. Contrary to its own statements opposing Kottle's CON application in 1992, the data presented by NWK in 1995 show that it knew of the need for kidney dialysis services in King County over the past 15 years.

In this action, Kottle alleged that NWK has unreasonably restrained trade and attempted to monopolize the market for kidney dialysis services in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. The complaint also alleged supplemental state law claims for violation of Washington's antitrust law, RCW 19.86.030 *et seq.* The district court dismissed the action for failure to state

---

1. Because this is an appeal from a dismissal for failure to state a claim, we take Kottle's factual allegations as true. *Federation of African American Contractors v. City of Oakland,* 96 F.3d 1204, 1207 (9th Cir.1996).

2. The record does not indicate whether Kottle exercised his right to appeal the Department's decision to an adjudicatory hearing.

a claim upon which relief can be granted. It held that NWK's activities were protected by the *Noerr–Pennington* doctrine. Kottle appeals, and we affirm.

## II. The Noerr–Pennington Doctrine

The First Amendment to the United States Constitution guarantees the right "to petition the Government for a redress of grievances." U.S. Const. amend. I, cl. 6. The Supreme Court has long recognized that for the Petition Clause to be a meaningful protection of the democratic process, citizens must be immune from some forms of liability for their efforts to persuade government officials to adopt policy or perform their functions in a certain way. In *Eastern RR Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Court rejected antitrust liability stemming from an aggressive lobbying campaign by railroads to persuade states to adopt legislation that would severely limit competition from truckers. The Court explained that "[i]n a representative democracy such as this … the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives." *Id.* at 137, 81 S.Ct. 523. The Court then concluded that the Sherman Act did not apply to the railroads' advocacy of legislative action, notwithstanding their anticompetitive intent. *Id.* at 138, 81 S.Ct. 523.

The Court subsequently expanded the holding of *Noerr* to include activities aimed at the executive and judicial branches of government. *United Mine Workers v. Pennington*, 381 U.S. 657, 669–70, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (executive); *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (judicial). The Court explained that "the right to petition extends to all departments of the Government," and therefore, "[t]he same philosophy governs the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government." *California Motor Transp.*, 404 U.S. at 512–13, 92 S.Ct. 609.

 This circuit has clarified that the *Noerr–Pennington* doctrine is not merely a narrow interpretation of the Sherman Act in order to avoid a statutory clash with First Amendment "values." Rather, the doctrine is a direct application of the Petition Clause, and we have used it to set aside antitrust actions premised on state law, as well as those based on federal law. *E.g., Amarel v. Connell*, 102 F.3d 1494, 1524 (9th Cir.1996). Thus, the *Noerr–Pennington* doctrine sweeps broadly and is implicated by both state and federal antitrust claims that allege anticompetitive activity in the form of lobbying or advocacy before any branch of either federal or state government.[3]

 Given the sweep of the *Noerr–Pennington* doctrine, we have no difficulty in joining our sister circuits to conclude that a lobbying effort designed to influence a state administrative agency's decision to issue a CON is within the ambit of the doctrine. *See Tarabishi v. McAlester Regional Hosp.*, 951 F.2d 1558, 1570 n. 17 (10th Cir.1991); *St. Joseph's Hosp. v. Hospital Corp. of America*, 795 F.2d 948, 955 (11th Cir.1986). Indeed, in *Boulware v. State of Nev. Dep't of Human Resources*, 960 F.2d 793 (9th Cir.1992), we applied the *Noerr–Pennington* doctrine in the context of a state lawsuit that invoked a CON program in an attempt to quash competition. *See also Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 577–78 (6th Cir. 1986) (same). The only difference between *Boulware* and this case is that the advocacy

---

3. Of course, since the Petition Clause mentions only the right "to petition the *Government* for a redress of grievances," U.S. Const. amend. I, cl. 6 (emphasis added), the *Noerr–Pennington* doctrine does not protect lobbying efforts directed at private organizations. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499–500, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988). Kottle reads into *Allied Tube* a distinction between "political" and "economic" lobbying activity, from which he argues that the *Noerr–Pennington* doctrine does not apply in this case because NWK's activities were designed only to promote NWK's own economic gain. Such a distinction would render the doctrine a nullity since it is doubtful that an antitrust defendant exists that was not motivated by economic gain. We read *Allied Tube* more narrowly, as merely recognizing the public/private distinction recognized in the Petition Clause itself.

here occurred before an administrative agency rather than a court. But since *Noerr–Pennington* protects advocacy before all branches of government, *California Motor Transp.*, 404 U.S. at 510, 92 S.Ct. 609, this is a distinction without a difference.[4] Accordingly, NWK's activities in this case implicate the *Noerr–Pennington* doctrine.

### III. The Sham Exception

The more difficult question is whether NWK's activities fall within the "sham" exception to the *Noerr–Pennington* doctrine. In *Noerr*, the Court acknowledged that "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere with the business relationships of a competitor, and the application of the Sherman Act would be justified." 365 U.S. at 144, 81 S.Ct. 523. In *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), the Court explained:

> The "sham" exception to *Noerr* encompasses situations in which persons use the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon. A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay. A "sham" situation involves a defendant whose activities are not genuinely aimed a procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so through improper means.

*Id.* at 380, 111 S.Ct. 1344 (citations and quotation marks omitted).

■ Although the *Noerr–Pennington* doctrine applies to activities directed at any branch of government, the scope of the sham exception depends on the type of governmental entity involved. *See California Motor Transp.*, 404 U.S. at 513, 92 S.Ct. 609 ("Mis-

representations, condoned in the political arena, are not immunized when used in the adjudicatory process."); *Boone v. Redevelopment Agency*, 841 F.2d 886, 896 (9th Cir. 1988). When the branch of government involved is a court of law, this circuit recognizes three circumstances in which an antitrust defendant's activities might fall into the sham exception. First, if the alleged anticompetitive behavior consists of bringing a single sham lawsuit (or a small number of such suits), the antitrust plaintiff must demonstrate that the lawsuit was (1) objectively baseless, and (2) a concealed attempt to interfere with the plaintiff's business relationships. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993); *Amarel*, 102 F.3d at 1518–19; *USS–POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council*, 31 F.3d 800, 810–11 (9th Cir.1994).

■ Second, if the alleged anticompetitive behavior is the filing of a series of lawsuits, "the question is not whether any one of them has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." *Id.* at 811 (citing *California Motor Transp.*, 404 U.S. at 512, 92 S.Ct. 609); *Oregon Natural Resources Council v. Mohla*, 944 F.2d 531, 534 (9th Cir.1991).

■ Finally, in the context of a judicial proceeding, if the alleged anticompetitive behavior consists of making intentional misrepresentations to the court, litigation can be deemed a sham if "a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy." *Liberty Lake Inv., Inc. v. Magnuson*, 12 F.3d 155, 158 (9th Cir.1993); *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1260 (9th Cir. 1982).

---

**4.** The present case is also analogous to *Assigned Container Ship Claims, Inc. v. American President Lines, Ltd.*, 784 F.2d 1420 (9th Cir.1986), in which we extended *Noerr–Pennington* immunity to petitions before the Federal Maritime Administration concerning the need for additional American flag ocean carrier service. *Id.* at 1422.

It is obvious that these three ways in which litigation might be a sham do not necessarily extend beyond the litigation context. For instance, if the alleged anticompetitive behavior consisted of lobbying a state legislature (as in *Noerr*), rather than filing a suit in state court, it would seem quite pointless to ask whether the lobbying effort was "objectively baseless." To decide objective baselessness, we would need objective standards, of which there are few, if any, in the political realm of legislation, against which to measure the defendant's conduct.

Similarly, the second and third variants of the litigation sham exception do not make sense in the legislative realm. Subjecting a defendant to antitrust liability because it pursued a pattern of baseless legal claims does not generate the same collateral consequences as subjecting the same defendant to antitrust liability because it engaged in numerous unsuccessful attempts to lobby a state legislature—the latter would eviscerate the Petition Clause. And the sham exception for intentional fraud on a court cannot lightly be taken to apply in a legislative context because, as the Supreme Court has observed, the political arena has a higher tolerance for outright lies than the judicial arena does. *California Motor Transp.*, 404 U.S. at 512–13, 92 S.Ct. 609.

Thus, the scope of the sham exception to the *Noerr–Pennington* doctrine depends on the branch of government involved. If it is the legislature, the sham exception is extraordinarily narrow. But if it is the judicial branch, this circuit recognizes three categories of anticompetitive behavior that can amount to a sham and, therefore, outside the protection of the *Noerr–Pennington* doctrine.

The present case, however, involves neither a court nor a legislature. Here we deal with asserted anticompetitive behavior directed at an administrative agency, and the question we must decide is what the scope of the sham exception is when the executive branch of the government is involved. Complicating our inquiry is the fact that the executive branch is radically diverse. At the federal level, it encompasses everything from formal hearings before independent administrative agencies, which are bound, both procedurally and substantively, by statutes and regulations, to the unapologetically political decisions of trade negotiators and other Presidential advisers. At the state level, executive officials can likewise be elected or appointed, and they also have greatly varying levels of discretion and independence.

It seems clear that for some kinds of executive entities, the sham exception to the *Noerr–Pennington* doctrine should be the same as it is for judicial bodies,[5] but for others such a sham exception would be far too broad. In recognition of the vastly different types of executive entities that exist, this circuit has generally shaped the sham exception according to our estimation of whether the executive entity in question more resembled a judicial body, or more resembled a political entity. In *Amarel,* for example, we analyzed the putatively sham litigation under the "objectively baseless" inquiry established by *Professional Real Estate.* 102 F.3d at 1519–20. We then lumped the petitioning of State Department officials and Korean government officials alongside the lobbying efforts directed at members of Congress, and brusquely held these petitioning efforts shielded by *Noerr–Pennington. Id.* at 1520. Similarly, in *Boone,* we noted that the administrative agency in question made decisions virtually unguided by enforceable standards and that these decisions could be appealed only to a legislative body. 841 F.2d at 896. We concluded that the agency was essentially a political body, and we refused to apply the broader sham exception that exists for judicial entities. *Id.* Our holding in *Boone* followed from a prior holding in *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Bd. of*

---

**5.** The Supreme Court suggested as much in *California Motor Transp.* when it lumped together courts and certain administrative agencies, and referred to them collectively as "adjudicatory tribunals" for purposes of the sham exception. 404 U.S. at 512, 92 S.Ct. 609. As should be clear from our opinion, this circuit does not read

*California Motor Transp.* to say that *all* administrative entities are equivalent to judicial ones for purposes of *Noerr–Pennington*. Rather, *California Motor Transp.* suggests that an administrative agency should be treated like a judicial one only if the former is, in fact, acting in an "adjudicatory" capacity.

*Culinary Workers,* 542 F.2d 1076 (9th Cir. 1976), that rejected the judicial sham exception for proceedings before the San Francisco Board of Permit Appeals, after concluding that the Board was essentially a political body. *Id.* at 1079.

By contrast, we have applied the judicial sham exception to proceedings before the Federal Maritime Administration, *Assigned Container,* 784 F.2d at 1423, and the Interstate Commerce Commission, *Clipper Exxpress,* 690 F.2d at 1262. We have suggested that the sham exception is narrower in communications with the police than it is in the legislative realm. *Forro Precision, Inc. v. IBM,* 673 F.2d 1045, 1060 (9th Cir.1982). We have also discussed the sham exception as it applies to activities directed at a state attorney general, *Harman v. Valley Nat'l Bank,* 339 F.2d 564, 566 (9th Cir.1964), and public airport officials, *In re Airport Car Rental Antitrust Litig.,* 693 F.2d 84, 86 (9th Cir. 1982), without clearly resolving the scope of the sham exception in those cases.

If the exact scope of the sham exception to the *Noerr–Pennington* doctrine has not always been clear in the administrative context, our cases at least stand for the general proposition that "the scope of immunity depends on the degree of political discretion exercised by the government agency." *Forro Precision,* 673 F.2d at 1060 n. 10. *See also Boone,* 841 F.2d at 896 ("If the agency and the council were acting as adjudicative bodies, the range of lobbying activities immunized by *Noerr–Pennington* would be much narrower.") Recent cases by the Supreme Court and this circuit (*e.g., Professional Real Estate, Amarel, USS–POSCO,* and *Liberty Lake*) have clarified the scope of the sham exception in judicial proceedings, but they do not alter this court's previous understanding that for purposes of the sham exception, executive entities are treated like judicial entities only to the extent that their actions are guided by enforceable standards subject to review. Only when administrative officials must follow rules is it meaningful to ask whether a petition before an agency was "objectively baseless," or whether there has been a pattern of petitioning without regard to the "merit" of the petitions. Similarly, our concern about intentional misrepresentation

to government officials is much greater outside of the political realm.

## IV. Kottle's Case

With this framework in mind, we now apply the sham exception to Kottle's case. The anticompetitive behavior that Kottle alleges consists of NWK's lobbying the Department against issuing a CON for KCKC's kidney dialysis center. Allegedly, NWK made numerous intentional misrepresentations to the Department and it engaged in improper and unlawful lobbying efforts.

If we thought that the Department was an essentially political entity, like the San Francisco Board of Permit Appeals, *see Franchise Realty,* 542 F.2d at 1079, Kottle's suit would have absolutely no merit at all. Misrepresentations are a fact of life in politics, *California Motor Transp.,* 404 U.S. at 512, 92 S.Ct. 609, and lobbying is the sine qua non of democracy. *Id.* at 510–11, 92 S.Ct. 609.

▮▮▮ We conclude, however, that the Department exercises a sufficiently circumscribed form of administrative authority that it is appropriate to apply the same sham exception here that we do in the litigation context. Heeding our own observation that executive entities come in many shapes and sizes, we will not list any single factor, or combination of factors, as decisive in determining whether the Department operates in a sufficiently non-political way to warrant application of the judicial sham exception. Rather, we look to the totality of the circumstances.

The CON determination by the Department bears many indicia of a true adjudicatory proceeding. The Department conducts public hearings, accepts written and oral arguments, permits representation by counsel, and allows affected persons to question witnesses. The Department must issue written findings after its hearing. Its decision is appealable, and that appeal is governed by APA procedures and statutory standards. In all, we believe that this combination of facts makes the application of the judicial sham exception appropriate in this case.

Thus, Kottle can get around the *Noerr–Pennington* doctrine only if his allegations

show one of three things: (1) NWK's advocacy before the Department was objectively baseless and merely an attempt to stifle competition; (2) NWK engaged in a pattern of petitions before the Department without regard to the merit of the petitions; or (3) NWK's misrepresentations before the Department deprived the entire CON proceeding of its legitimacy. We can easily dispense with the second of these grounds because Kottle's complaint alleges interference with only two CON applications. *See Amarel,* 102 F.3d at 1519 (holding that a handful of legal proceedings does not amount to a "pattern" of baseless claims).

We can also dispense with the first of these grounds. NWK's advocacy before the Department was not objectively baseless because NWK prevailed. In the litigation context, the Supreme Court has reminded us that a winning lawsuit is, by definition, not objectively baseless. *Professional Real Estate,* 508 U.S. at 61 n. 5, 113 S.Ct. 1920. Because we view the CON hearing as analogous to litigation, we must conclude that a victory before the Department necessarily indicates that NWK's position was not objectively baseless. *See Franchise Realty,* 542 F.2d at 1079 ("We find it particularly hard to accept the characterization as 'baseless' or 'frivolous' of opposition which is entirely successful in obtaining the governmental action sought, as apparently was the case here.") We note that Kottle did have the right to appeal the Department's decision, and had he obtained a reversal of the Department's denial of the CON, then NWK's initial victory before the Department would not necessarily indicate that NWK's position was not objectively baseless. *Hydranautics v. Filmtec Corp.,* 70 F.3d 533, 538 (9th Cir.1995). A winning lawsuit that is overturned on appeal, after all, is not a winning lawsuit, and the same logic applies to an administrative ruling. As far as the record discloses, however, Kottle did not appeal the Department's ruling. Therefore, the success of NWK's opposition to Kottle's CON applications conclusively demonstrates that the opposition was not objectively baseless.

This leaves Kottle with only the third of the sham exception possibilities. Notwithstanding *Noerr–Pennington,* Kottle can overcome a 12(b)(6) motion if his allegations demonstrate that NWK so misrepresented the truth to the Department that the entire CON proceeding was deprived of its legitimacy. Kottle's complaint, however, falls far short of adequately alleging this variant of the sham exception. He alleges in very general terms that NWK engaged in a hostile campaign to oppose the CON applications; that it used "means which were improper and/or unlawful"; that it conspired with other unnamed entities to oppose Kottle's CON applications; that it made misrepresentations about Kottle and the need for a kidney dialysis center, and encouraged others to do so; and that these statements influenced the Department's decision.

From Kottle's complaint, we do not know exactly what representations NWK made, or to whom; with whom NWK conspired; what exactly its "improper and/or unlawful" methods of advocacy were; or what other testimony the Department may have had that could have influenced its decision to deny Kottle's CON application. Normally, we would be willing to give Kottle the benefit of the doubt, because in reviewing a dismissal for failure to state a claim, we usually ask ourselves whether the plaintiff could prove *any* set of facts that would entitle him to relief.[6] *Franchise Realty,* 542 F.2d at 1082. This case is different, however, because when "a plaintiff seeks damages . . . for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required." *Id.* at 1083.

In such cases, we employ a heightened pleading standard, and that standard "would have no force if in order to satisfy it, a party could simply recast disputed issues from the underlying litigation as 'misrepresentations' by the other party." *Mohla,* 944 F.2d at 536 (citing *Omni Resource Dev. Corp. v. Conoco, Inc.,* 739 F.2d 1412, 1414 (9th Cir.1984)).

---

**6.** It also appears that Kottle has taken his "best shot." The record does not disclose that he requested leave to amend his complaint.

■ We conclude, that Kottle's vague allegations of misrepresentation "are therefore insufficient to overcome *Noerr–Pennington* protection." *Id.*[7]

AFFIRMED.

7. In addition to his challenge to NWK's *Noerr–Pennington* immunity, Kottle contends that the district court erred in not striking an affidavit attached to NWK's reply memorandum in support of its motion to dismiss. The affidavit's sole purpose was to put before the court certain public records of the Department. We agree with the district court that these records were properly the subject of judicial notice; therefore, reliance on them did not convert the motion to dismiss into a summary judgment motion. *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir.1994).

