WOODALL, Justice.
The Town of Gurley (“the Town”) and Stan Simpson, individually and as mayor of the Town, separately petition this Court for writs of mandamus directing the trial court to grant their motions for a summary judgment as to all claims brought against them by M & N Materials, Inc. (“M & N”). We deny the petitions in part and grant them in part.

I. Factual and Procedural Background

M & N was formed in 2003. At that time, M & N acquired 160 acres of mountain property to be used as a rock quarry in an unincorporated area of Madison County. By June 2004, it had purchased approximately 109 additional acres in the unincorporated area for use in connection with the quarry. For convenience, we will refer to the 269 acres as “the property.” The property was located approximately one mile from the residence of Stan Simpson.
In July 2003, more than a year before his election as mayor of the Town, Simpson became the chairperson of a group of residents of the Town known as the Citizens for a Better Gurley (“the CBG”). Between July 2003 and November 23, 2004, the CBG actively opposed the operation of a rock quarry on the M & N property. On July 17, 2003, the Town council adopted Resolution no. 216, which stated, in pertinent part:
“WHEREAS, the Town Council of the Town of Gurley has obtained information from the Alabama Department of Environmental Management that a corporation by the name of M & N, Incorporated, has applied for a permit to operate a rock quarry near the corporate limits of the Town of Gurley, and
“WHEREAS, the Town Council has serious concerns regarding the effects such a rock quarry would have on (1) air quality, (2) damage from blasting to homes and businesses, (3) large volumes of traffic on Gurley Pike (the main service road for Madison County Elementary School), (4) damage to existing streets by heavy trucks and (5) damage to the Town’s water storage tank located on Gurley Pike,
“NOW, THEREFORE, be it resolved that the Town of Gurley opposes the location of a rock quarry near the corporate limits of the Town.”
Simpson spoke often at Town council meetings in opposition to the quarry. Also, the CBG contacted State Senator Lowell Barron and State Representative Albert Hall to enlist their aid in opposing the quarry. Simpson and Representative Hall collaborated on House Bill 170, a bill that Representative Hall introduced in the Alabama Legislature during the 2004 legislative session. The bill, which became law on February 26, 2004, see Act No. 2004-19, Ala. Acts 2004, authorized the Town to annex M & N’s property on the basis of a majority vote of the Town’s residents in a special annexation referendum. According to Simpson, the purpose of the annexation was to give the Town control over the use of the property. The referendum was conducted on April 13, 2004, and the annexation proposal passed by 191 votes to 23 votes.
On April 21, 2004, M & N applied to the Town for a business license. The application was denied. On May 4, 2004, the Town imposed “an immediate moratorium on the acceptance of applications for use permits, building permits, right-of-way permits, zoning classification, variances, special exceptions or business licenses relating to” the property.
*20 In approximately April 2004, Simpson began a campaign for the office of mayor of Gurley. During his campaign, he pledged to “fight against the rock quarry.” He was elected on August 24, 2004, and assumed the duties of the office on October 4, 2004, serving as, among other things, a voting member of the Town council.
Meanwhile, on July 12, 2004, M & N entered into an agreement with Vulcan Lands, Inc. (“Vulcan Lands”), whereby Vulcan Lands acquired an option to purchase the property for $3.75 million. The option was to expire on November 15, 2004. Vulcan Lands failed to exercise its option, according to M & N, because of M & N’s failure to acquire a business license from the Town. Nevertheless, on November 23, 2004, M & N sold the property to Vulcan Lands.
On that day, M & N executed two documents relating to the disposition of the property. One document was a general warranty deed by which M & N sold the property to Vulcan Lands for an un disclosed amount. In an interrogatory answer, M & N stated: “Vulcan backed out [of the option price] because of no City of Gurley [business] license. This reason [is the] sole reason [that was] quoted from ... Vulcan ... as to why Vulcan would not close.” The warranty deed contained no reservations of rights or ownership.
That same day, M & N entered into a royalty agreement (“the agreement”) with “Vulcan Construction Materials LP, a Delaware Limited Partnership, by and through its Southern & Gulf Coast Division” (“Vulcan Materials”). The agreement provided, in pertinent part:
“WHEREAS, contemporaneously with the execution and delivery of this Agreement, Vulcan [Materials] (or its affiliates) and [M & N] are executing other agreements whereby, among other understandings, [Vulcan Lands] will acquire title to approximately 269 acres of real property near [the Town] in Madison County, Alabama, heretofore owned by [M & N] (‘the Property’);
“WHEREAS, Vulcan [Materials] is engaged in the business of mining, crushing, producing, distributing, transporting, and marketing of crushed stone products used in the construction industry (‘Quarrying Operations’);
“WHEREAS, Vulcan [Materials] intends to enter into a lease arrangement with Vulcan [Lands] that will allow Vulcan [Materials] to conduct Quarrying Operations on the Property; and
“WHEREAS, the parties desire to set forth their understanding concerning payment of royalties to [M & N] and other terms related to the sale by Vulcan [Materials] of crushed stone construction aggregates (‘Stone’) recovered from the Property.
“NOW, THEREFORE, for and in consideration of the mutual execution of this Agreement and the covenants and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do agree as follows.... ”
(Emphasis added.)
Under the agreement, Vulcan Materials was to pay M & N “earned royalties,” which were “equivalent to 5% of the Average Annual Sales Price ... of Stone quarried, sold and removed from the Property (the ‘Earned Royalty(ies)’) during each Contract Year of the Term.” The agreement provided for a “minimum royalty payment” in the following terms:
“If the total of all Earned Royalties payable by Vulcan [Materials] by the end of a Contract Year is less than Fifty Thousand Dollars ($50,000) (the ‘Mini *21 mum’), Vulcan [Materials] shall pay [M & N] an additional royalty payment equivalent to the difference between the Earned Royalties with respect to that Contract year and $50,000, which amount is hereinafter referenced as the ‘Earned Royalty Shortfall.’ ”
According to M & N, the consideration for the sale of the property was actually $1 million, plus the royalty payments and obligations due under the agreement.
The agreement also stated that Vulcan Materials had “no obligation to mine”:
“[M & N] acknowledges that Vulcan [Materials] shall have the right, but not the obligation, to conduct Quarrying Operations on the Property ... during the Term, it being agreed that the payment of the Earned Royalty Shortfall ... and consideration paid by Vulcan [Materials] at the time of conveyance of the Property is made in lieu of any such obligation.”
(Emphasis added.)
Finally, the agreement provided that Vulcan Materials would be “relieved from the obligation to make any payments to [M & N]” if prevented “by operation of law” from “conducting Quarrying Operations on the Property.” In particular, it stated: “Vulcan [Materials’] obligations to perform ... shall be suspended during the period it is so prevented from conducting Quarrying Operations. Vulcan, in its sole discretion, shall determine what action (if any) shall be undertaken to litigate, oppose or otherwise challenge an event constituting Operation of Law.” (Emphasis added.) “Operation of law” included condemnation, the exercise of the right of eminent domain, and zoning or such other land-use restrictions. In that connection, the agreement further provided:
“In the event of a Taking of the Property ..., [M & N] hereby assigns to Vulcan [Materials] its claim, interest, or right (if any) in any award that may be made in such proceeding. Further, [M & N] agrees that Vulcan [Materials] shall have the sole right and obligation to seek compensation and retain damages caused by the Taking.”
(Emphasis added.)
On January 18, 2005, Vulcan Materials applied to the Town for a license to operate the business of “Quarrying and Processing Construction Aggregates” on the property. That same night, the Town, council adopted Ordinance no. 2004-284, which designated the property as an agricultural zone. Simpson, as mayor, subsequently sent Vulcan Materials a letter denying the application, stating, in pertinent part: “ ‘Quarrying and Processing Construction Aggregates’ is not a use permitted under the Agricultural [zoning] classification now applicable to the property in question.” Simpson admits that he was directly involved in the decision to deny the license application of Vulcan Materials. As a consequence of the denial of permission to operate the rock quarry, Vulcan Materials has paid M & N no royalties.
Subsequently, M & N sued the Town and Simpson. Also named as defendants in M & N’s complaint were (1) Vulcan Lands, (2) Vulcan Materials, and (8) Vulcan Materials Company (hereinafter referred to collectively as “the Vulcan entities”). The complaint alleged that at all times relevant to the claims against him “Simpson was acting in his individual capacity and/or his representative capacity on behalf of the Town.” The claims against Simpson included interference with business or contractual relations and negligence and/or wantonness and sought declaratory and/or injunctive relief. The claims against the Town included inverse condemnation and negligence and also sought declaratory and/or injunctive relief.
*22 The Vulcan entities were named “by virtue of the provisions of Ala.Code § 6-6-227 (1975), which requires that all persons shall be made parties who have or claim any interest which would be affected by the declaration.” The Vulcan entities have filed a “motion to be excused from participation at trial.” In that motion, they “agree[d] to be bound by any judgment entered with regard to [M & N’s] declaratory judgment claim.”
Simpson and the Town each moved for a summary judgment. Simpson argued, among other things, that he was entitled to absolute immunity for any actions he took relating to the property, either before or after he became mayor. The Town challenged M & N’s standing to bring the action. The Town also adopted Simpson’s summary-judgment motion and brief in support of the motion. In opposition to the motions, M & N presented, among other things, evidence indicating that Simpson had, many years ago, pleaded guilty to two misdemeanor criminal charges in Tennessee. On April 16, 2009, the trial court denied the motions.
Simpson filed his petition on May 8, 2009, in case no. 1080981; the Town filed its petition on May 11, 2009, in case no. 1081027. Both petitions challenge M & N’s standing to prosecute the underlying action. Also, the Town’s petition asserts the defense of absolute immunity against the claim based on Simpson’s alleged negligence. Similarly, Simpson’s petition asserts the defense of absolute immunity against the claims alleging against him interference with business or contractual relations and negligence and/or wantonness. Each petition seeks a writ of mandamus (1) directing the trial court to vacate its order of April 16, 2009, denying Simpson’s and the Town’s summary-judgment motions, and (2) ordering it to enter a judgment in favor of the movant.
Mandamus review of the denial of a summary-judgment motion “grounded on a claim of immunity” is an exception to the general rule against interlocutory review of the denial of summary-judgment motions. Ex parte Auburn Univ., 6 So.3d 478, 483 (Ala.2008); Ex parte Hudson, 866 So.2d 1115, 1120 (Ala.2003). In those exceptional cases, “[w]e confine our interlocutory review to matters germane to the issue of immunity. Matters relevant to the merits of the underlying tort claim, such as issues of duty or causation, [we leave] to the trial court....” 866 So.2d at 1120.
Likewise, “[m]andamus review is available where the petitioner challenges the subject-matter jurisdiction of the trial court based on the plaintiffs alleged lack of standing to bring the lawsuit.” Ex parte HealthSouth Corp., 974 So.2d 288, 292 (Ala.2007). A writ of mandamus is a drastic and extraordinary writ that will issue to compel a summary judgment on immunity grounds only upon a showing of a clear legal right in the petitioner to the immunity sought. Hudson, 866 So.2d at 1117.

II. Discussion

We first consider the issues and arguments related to M & N’s standing.

A. Standing

“ ‘To be a [person with standing], the person must have a real, tangible legal interest in the subject matter of the lawsuit.’ Doremus v. Business Council of Alabama Workers’ Comp. Self-Insurers Fund, 686 So.2d 252, 253 (Ala.1996). Specifically, ‘[standing ... turns on “whether the party has been injured in fact and whether the injury is to a legally protected right.” ’ Property at 2018 Rainbow Drive, 740 So.2d *23 [1025,] 1027 [ (Ala.1999) ] (quoting Romer v. Board of County Comm’rs of the County of Pueblo, 956 P.2d 566, 581 (Colo.1998) (Kourlis, J., dissenting)).”
Ex parte Chemical Waste Mgmt., Inc., 929 So.2d 1007, 1010 (Ala.2005) (emphasis omitted).
The standing arguments of the Town and Simpson identify and focus on two distinct phases of this dispute, namely, events that occurred before the sale of the property to Vulcan Lands and events that occurred after the sale. Central to these arguments is the proposition that the sale of the property, in conjunction with the execution of the agreement, divested M & N of standing to sue.

1. Pre-Sale Events

A central theory of M & N’s case is that a taking of the property occurred either before or after the sale. The pre-sale events of which it complains are (1) the “initial annexation of the subject property into [the Town] in April 2004, [ (2) ] the denial of the business license to M & N in April 2004, and [ (3) ] the moratorium placed on the issuance of business licenses thereafter.” M & N’s brief, at 16 n. 2 (case no. 1081027). M & N alleges that these activities of Simpson and the Town cost it the opportunity to sell the property at the original price of $3.75 million, thus resulting in the injury in fact necessary for standing.
The Town correctly notes that the general warranty deed by which M & N conveyed the property to Vulcan Lands contained “no reservation of any rights to the alleged condemned property.” Town’s petition, at 13 (case no. 1081027). The Town then argues: “As there were no reservations in the deed ..., all of M & N’s rights to the property were conveyed and ... lost.... Therefore, it is clear that M & N has no standing to bring this cause of action for actions which occurred prior to the conveyance.... ” Town’s petition, at 13 (case no. 1081027). We disagree.
“Inverse condemnation is the taking of private property for public use without formal condemnation proceedings and without just compensation being paid by a governmental agency or entity which has the right or power of condemnation.” McClendon v. City of Boaz, 395 So.2d 21, 24 (Ala.1981). “[T]he cause of action [for inverse condemnation] accrues when the taking is complete.” Id.
“The law is well-settled that ‘any damage suffered as a result of [a] taking ... would have been suffered by the owner at the time the damage became ascertainable[.] ... [T]he damage claim based on inverse condemnation [does] not pass to subsequent grantees of the land.’ ” State ex rel. City of Blue Springs v. Nixon, 250 S.W.3d 365, 370 (Mo.2008) (quoting Crede v. City of Oak Grove, 979 S.W.2d 529, 534 (Mo.Ct.App.1998) (emphasis added)). See also Steinle v. City of Cincinnati, 142 Ohio St. 550, 555, 53 N.E.2d 800, 803 (1944) (“The general rule is that the right to damages for the taking of land or for injury to land is in the one who owns the land when the taking or injury occurs, and does not ordinarily pass to a subsequent grantee. 29 Corpus Juris Secun-dum, Eminent Domain, p. 1115, § 202; 30 Corpus Juris Secundum, Eminent Domain, p. 101, § 389. See 18 American Jurisprudence, 864, Section 231. Any right on the part of the subsequent grantee to damages is dependent on a new taking or injury after his acquisition of title. 30 Corpus Juris Secundum, Eminent Domain, p. 102, § 390.”). Indeed, Alabama has regarded this rule as “well settled” since 1927. Alabama Great Southern R.R. v. Brown, 215 Ala. 533, 535, *24 112 So. 131, 132 (1927) (facts analogous to inverse condemnation).
If there was a taking in April or May-2004 as M & N alleges — and we express no view either way — the cause of action for inverse condemnation accrued to M & N at that time. The conveyance of the property in November 2004 did not divest M & N of the right to bring an action for compensation on the basis of the pre-sale events of which M & N complains. Consequently, M & N has standing to seek redress for the allegedly wrongful pre-sale events involving Simpson and the Town.

2. Post-Sale Events

The post-sale events of which M & N complains are (1) the denial of a business license to Vulcan Materials on January 18, 2005, and (2) the zoning of the property for agricultural use that same night. According to M & N, it has standing to seek redress for these post-sale events on the basis of the agreement, which purported to give M & N the right to receive royalty payments from the sale of stone removed from the property.
Simpson and the Town do not dispute that the agreement purports to give M & N a contract right in the mineral estate of the property. They cite no authority for the proposition that one has no standing to assert its own contractual right. Instead, they contend that the conveyance from M & N to Vulcan Lands vested title to the property in Vulcan Lands — not Vulcan Materials. Thus, according to Simpson and the Town, M & N could have acquired no interest in the mineral estate on the basis of the agreement, because, they say, Vulcan Materials, itself, had no such interest. They also correctly point out that, although the agreement contemplates a “lease arrangement [between Vulcan Materials and] Vulcan [Lands] that [would] allow Vulcan [Materials] to conduct Quarrying Operations on the Property,” the record contains no evidence of any such arrangement.
What Simpson and the Town overlook, however, is that the agreement obligates Vulcan Materials to pay a “minimum royalty payment” of $50,000, regardless of whether it actually mines any rock. The only relevant exception to that payment obligation is “an event constituting Operation of Law,” which includes a “taking” or “any zoning or land use restrictions.” In other words, M & N’s right to receive royalty payments from Vulcan Materials exists independent of the technical relationship between the Vulcan entities, or between Vulcan Materials and the property. Consequently, M & N has adequately alleged an “injurfy] in fact ... to a legally protected right” for standing purposes on the basis of the post-sale events of which it complains.
Simpson and the Town also contend that M & N lacks standing as to the post-sale events on the bases of those provisions of the agreement pursuant to which M & N “agree[d] that Vulcan [Materials should] have the sole right and obligation to seek compensation caused by [any] Taking [of the property]” and the right to M & N’s “claim, interest or right (if any) in any award that [might] may be made” as the result of such a taking. More specifically, the Town argues: “M & N ceded to Vulcan Materials the sole authority to challenge governmental decisions prohibiting quarrying operations on the subject property. Vulcan Materials has elected not to challenge the decisions made by the Town ... respecting the rock quarry and M & N cannot claim standing to assert any rights of Vulcan Materials.” The Town’s petition, at 15. We disagree. This argument confuses the standing issue with the issue whether M & N is the real party in interest.
*25 Although the standing requirement serves to ensure that the party making a claim has, in fact, suffered an “ ‘ “injury ... to a legally protected right,” ’ ” State v. Property at 2018 Rainbow Drive, 740 So.2d 1025, 1027 (Ala.1999) (quoting Romer v. Board of County Comm’rs of the County of Pueblo, 956 P.2d 566, 581 (Colo.1998) (emphasis omitted)), “the real party in interest principle is a means to identify the person who possesses the right sought to be enforced.” Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1542, at 327 (1990) (emphasis added) (hereinafter Federal Practice). See Ala. R. Civ. P. 17(a) (“Every action shall be prosecuted in the name of the real party in interest.”). “Under present law an assignment passes the title to the assignee so that he is the owner of any claim arising from the chose and should be treated as the real party in interest under Rule 17(a)[, Fed.R.Civ.P.].” Federal Practice § 1545, at 346.
The distinctions between the standing principle and the real-party-in-interest principle are particularly significant for procedural reasons. While standing is a necessity for subject-matter jurisdiction and objections to standing are not waivable, “objections based upon an action’s not being prosecuted in the name of the real party in interest can be waived.” Ex parte Sterilite Corp. of Alabama, 837 So.2d 815, 819 (Ala.2002). Although this Court is duty-bound to notice and address the absence of standing and hence subject-matter jurisdiction ex mero motu, Cadle Co. v. Shabani, 4 So.3d 460, 462 (Ala.2008), it is not so bound when the issue is whether the action is being prosecuted in the name of the real party in interest. See Ex parte Sterilite, 837 So.2d at 819.
In this case, the argument might have been made that M & N is not the real party in interest because of the provisions in the agreement purporting to assign to Vulcan Materials M & N’s right to “litigate, oppose or otherwise challenge an event constituting Operation of Law.” However, no argument has been made in this case regarding who is the real party in interest.
“The burden of establishing a clear legal right to the relief sought rests with the petitioner. [Ex parte] Cincinnati Insurance [Cos.], 806 So.2d [376,] 379 [ (Ala.2001) ]. It is not this Court’s function to do independent research to determine whether a petitioner for a writ of mandamus has established a clear legal right."
Ex parte Metropolitan Prop. & Cas. Ins. Co., 974 So.2d 967, 972 (Ala.2007) (emphasis added). Arguments not made as a basis for mandamus relief are waived. Ex parte Navistar, Inc., 17 So.3d 219, 221 n. 1 (Ala.2009).
M & N has alleged a post-sale injury sufficient to create standing. Moreover, because the petitioners have not invoked the principle of real party in interest, we decline to consider it. See Ex parte Sterilite, supra (declining to consider the argument that plaintiff is not a real party in interest as a basis for mandamus relief when the petitioner had confined its arguments to standing). We now turn to the various issues regarding immunity.

B. Immunity

Simpson contends that he is entitled to absolute immunity for all actions he took to oppose the rock quarry before his election to the office of mayor. This is so, because, he insists, his conduct as a private citizen is protected by the rule set forth in Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 *26 (1965) (“the Noerr-Pennington doctrine”). Additionally, Simpson and the Town contend that they are entitled to absolute immunity for all post-election events on the basis of legislative immunity. We first address Simpson’s claim of immunity for his pre-election conduct.
1. Immunity Under the Noerr-Penning-ton Doctrine
“The Noerr-Pennington doctrine derives from the First Amendment’s guarantee of ‘the right of the people ... to petition the Government for a redress of grievances.’ U.S. Const, amend. I. Under the Noerr-Pennington doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct. Empress LLC v. City & County of S.F., 419 F.3d 1052, 1056 (9th Cir.2005) (citing Manistee Town Ctr. v. City of Glendale, 227 F.3d 1090, 1092 (9th Cir.2000)).
“The Noerr-Pennington doctrine arose in the antitrust context and initially reflected the Supreme Court’s effort to reconcile the Sherman Act with the First Amendment Petition Clause. In Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), trucking companies brought suit against railroad companies alleging that efforts by the railroads to influence legislation regulating trucking violated the Sherman Act. Id. at 129, 81 S.Ct. 523. The Court held that ‘the Sherman Act does not prohibit ... persons from associating ... in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly.’ Id. at 136-37, 81 S.Ct. 523. In reaching this conclusion, the Court observed that construing the Sherman Act to reach such conduct ‘would raise important constitutional questions’ respecting the right of petition, stating ‘we cannot ... lightly impute to Congress an intent to invade ... freedoms’ protected by the Bill of Rights. Id. at 138, 81 S.Ct. 523.
“United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), extended this antitrust immunity to those engaging in lobbying activities directed toward executive branch officials, regardless of any anti-competitive intent or purpose. Subsequently, in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Court, recognizing that ‘the right to petition extends to all departments of the government’ and that ‘[t]he right of access to the courts is ... but one aspect of the right of petition,’ extended Noerr-Pennington immunity to the use of ‘the channels and procedures of state and federal ... courts to advocate [groups’] causes and points of view respecting resolution of their business and economic interests vis-á-vis their competitors.’ Id. at 510-11, 92 S.Ct. 609 (emphasis added).
“Recognizing the constitutional foundation of the doctrine, the Supreme Court has applied Noerr-Pennington principles outside the antitrust field. [See BE & K Construction Co. v. NLRB, 536 U.S. 516 (2002); Bill Johnson’s Restaurants, Inc. v. NLRB, 461 U.S. 731 (1983) ].”
Sosa v. DIRECTV, Inc. 437 F.3d 923, 929-30 (9th Cir.2006). Additionally, lower courts have applied the doctrine in a variety of contexts. A number of courts have applied the doctrine to preclude common-law claims of tortious interference with a business relationship. See Havoco of America, Ltd. v. Hollobow, 702 F.2d 643 (7th Cir.1983); First Nat’l Bank of Omaha *27 v. Marquette Nat’l Bank Minneapolis, 482 F.Supp. 514 (D.Minn.1979), aff'd, 636 F.2d 195 (8th Cir.1980); Pennwalt Corp. v. Zenith Labs., Inc., 472 F.Supp. 413 (E.D.Mich.1979); Sierra Club v. Butz, 349 F.Supp. 934 (N.D.Cal.1972); Grand Cmtys., Ltd. v. Stepner, 170 S.W.3d 411, 416 (Ky.Ct.App.2004); and Anderson Dev. Co. v. Tobias, 116 P.3d 323, 332 (Utah 2005).
Also, the doctrine has been applied in zoning disputes such as this one. See City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 380-82, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991); Gorman Towers, Inc. v. Bogoslavsky, 626 F.2d 607, 615 (8th Cir.1980) (the Noerr-Pennington doctrine provided immunity for residents whose conduct allegedly “consisted of [obtaining] a zoning amendment and participating in the spread of false derogatory rumors about [a] proposed housing project” in order to block the project); Weiss v. Willow Tree Civic Ass’n, 467 F.Supp. 803, 809 (S.D.N.Y.1979) (defendants who formed a large civic group to “delay and obstruct [an] application for a zoning permit, ... [which obstruction was] effectuated by defendants’ attending meetings before official bodies, ... placing an advertisement in a local paper, distributing handbills, and conducting public meetings for the purpose of arousing and encouraging opposition to the application” were entitled to immunity under the Noerr-Pennington doctrine); Grand Cmtys., Ltd. v. Stepner, 170 S.W.3d at 416 (“any attempts [by a property owner to persuade a municipality to annex adjoining property to prevent its rezoning for residential development] were protected by the Noerr-Pennington doctrine”); and Anderson Dev. Co. v. Tobias, 116 P.3d at 332.
M & N essentially concedes that the Noerr-Pennington doctrine ostensibly applies to Simpson’s pre-election activities. The only significant issue is whether Simpson’s activities fall within the “sham” exception to the doctrine.
“The ‘sham’ exception to Noerr encompasses situations in which persons use the governmental process — as opposed to the outcome of that process— as an anticompetitive weapon. A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay.”
City of Columbia, 499 U.S. at 380, 111 S.Ct. 1344. “A ‘sham’ situation involves a defendant whose activities are ‘not genuinely aimed at procuring favorable government action’ at all, ... not one ‘who “genuinely seeks to achieve his governmental result, but does so through improper means Id. (quoting Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 508 n. 10, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), quoting in turn Sessions Tank Liners, Inc. v. Joor Mfg., Inc., 827 F.2d 458, 465 n. 5 (9th Cir.1987)).
“Although the Noerr-Penning-ton doctrine applies to activities directed at any branch of government, the scope of the sham exception depends on the type of governmental entity involved.” Kottle v. Northwest Kidney Ctrs., 146 F.3d 1056, 1060 (9th Cir.1998). “If it is the legislature, the sham exception is extraordinarily narrow.” 146 F.3d at 1061 (emphasis added). This is so, because if the challenged conduct consists of lobbying a legislative body, as in the situation here presented, “it would seem quite pointless to ask whether the lobbying effort was ‘objectively baseless.’ ” Id. Moreover, “the sham exception for intentional fraud on a court cannot lightly be taken to apply in a legislative context, because, as the Supreme Court has observed, the political arena has a higher tolerance for outright *28 lies than the judicial arena does.” Id. (citing California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 512-13, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (emphasis added)).
Simpson was not a competitor of M & N. In fact, he lived near the proposed quarry and there are no allegations that his lobbying efforts were not genuinely aimed at blocking the rock quarry or that his actions were those of a competitor designed merely to injure a rival. On the contrary, M & N says: “[Simpson’s] actions went beyond simply petitioning the government for redress into orchestrating a well designed, improper campaign to stop a quarry on the M & N property at all costs.” M & N’s brief, at 14 (case no. 1080981). Simpson chaired the CBG, a group formed for the purpose of defeating the rock-quarry proposal. He spoke often at Town council meetings in opposition to the quarry. He collaborated with Representative Hall in the passage of Act No. 2004-19, which facilitated the annexation by the Town of the property for the purpose of defeating the quarry. According to the complaint, Simpson’s conduct was aimed at “wrongfully annexing the subject property into the city limits, imposing a moratorium on issuing business licenses, rezoning the subject property to a classification that wrongfully prohibited the lawful activities of [M & N], and ... wrongfully refusing to permit [M & N] and or Vulcan [Materials] to operate a quarry.”
Thus, to the extent these activities predated Simpson’s election as mayor, they fall squarely within the scope of the Noerr-Pennington doctrine and are outside the scope of the sham exception. Simpson has, therefore, demonstrated a clear, legal right to a summary judgment as to the claims based on his pre-election conduct.

2. Legislative Immunity

Simpson and the Town next contend that they are protected from liability by the doctrine of absolute legislative immunity for the post-election events of which M & N complains, namely, (a) the zoning of the property for agricultural use, and (b) the denial of Vulcan Materials’ business-license application.
At the outset, Simpson’s assertion of legislative immunity is assailed by M & N, which proposes that the misdemeanor criminal charges to which Simpson pleaded guilty in Tennessee not only disqualified him to serve as mayor of the Town, but also strip Simpson of his immunity. For that proposition, M & N cites Ala.Code 1975, § 36-2-1, which provides, in pertinent part:
“(a) The following persons shall be ineligible to and disqualified from holding office under the authority of this state:
[[Image here]]
“(3) Those who shall have been convicted of treason, embezzlement of public funds, malfeasance in office, larceny, bribery or any other crime punishable by imprisonment in the state or federal penitentiary and those who are idiots or insane.”
(Emphasis added.) M & N contends that the criminal charges to which Simpson pleaded guilty constituted “larceny” as defined by Alabama caselaw and statutory law. Therefore, according to M & N, Simpson is not qualified to hold office, and he is ipso facto stripped of any immunity he might have had for acts performed while improperly in office.
Against these assertions, Simpson cites Ala.Code 1975, § 36-1-2, which provides:
“The official acts of any person in possession of a public office and exercising the functions thereof shall be valid *29 and binding as official acts in regard to all persons interested or affected thereby, whether such person is lawfully entitled to hold office or not and whether such person is lawfully qualified or not, but such person shall be liable to all penalties imposed by law for usurping or unlawfully holding office or for exercising the functions thereof without lawful right or without being qualified according to law.”
(Emphasis added.) Simpson argues that the only penalty imposed by law for unlawfully holding office is a $100 fine prescribed by Ala.Code 1975, § 36-2-2. Simpson contends that, regardless of whether the criminal charges against him amounted to larceny, his convictions for those charges do not strip him of any immunity he might otherwise have for the acts performed while he is in office.
We agree with this contention. Regardless of the nature of the crimes underlying Simpson’s convictions, Simpson is a mayor de facto as contemplated by § 36-1-2. As such, both he and his official acts are clothed with the mantle of his office. See also Turley v. United States, 503 F.Supp.2d 912, 916 (N.D.Ohio 2007) (“Defenses are as available to [a de facto officer] as they are to a duly appointed officer.”).

(a) The Zoning Ordinance

Applying the legislative-immunity doctrine, this Court recently said:
“‘[T]he tort liability rule for public officials and employees of Restatement (Second) of Torts, § 895D, Public Officers (1974), is consistent with Alabama’s ease law development in the area of “substantive immunity.” That section of the Restatement provides:
[[Image here]]
“ ‘ “(2) A public officer acting within the general scope of his authority is immune from tort liability for an act or omission involving the exercise of a judicial or legislative function.” ’
“(Emphasis added.) This legislative immunity is well established and universal in nearly every state. See, e.g., Bogan v. Scott-Harris, 523 U.S. 44, 46, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998) (Tt is well established that federal, state, and regional legislators are entitled to absolute immunity from civil liability for their legislative activities.’).
“Moreover, it is well settled that the consideration and enactment of zoning ordinances is a legislative function. See, e.g., Waters v. City of Birmingham, 282 Ala. 104, 107-08, 209 So.2d 388, 391 (1968) (‘A city governing body in considering a zoning ordinance, as in [the] case of any other ordinance, acts in a legislative capacity.’); and Corn v. City of Lauderdale Lakes, 997 F.2d 1369, 1392 (11th Cir.1993) (‘[A]ctions taken in connection with promulgating zoning ordinances and classifications, even the decision about which zoning classification should be applied to a specific parcel of land, are legislative actions for which local legislators are absolutely immune.’).”
Peebles v. Mooresville Town Council, 985 So.2d 388, 398 (Ala.2007) (final emphasis added).
Because the passage of Ordinance no. 2004-284 designating the property as an agricultural zone was a legislative function, Simpson is immunized from liability for his participation as a voting member of the Town council in passing that ordinance. A different analysis is required, however, for the denial of Vulcan Materials’ license application.

*30
(b) Denial of the License Application

“[Legislative] immunity applies only to actions that are inherently legislative (policy-making) as opposed to administrative (policy-applying). Corn v. City of Lauderdale Lakes, 997 F.2d 1369 (11th Cir.1993). Thus, applications [emphasis in original] of general city policy to a specific party, even if undertaken by city officials who would be immune from suit for the creation [emphasis in original] of that policy, are not protected by legislative immunity....
“.... Introducing ordinances ... is different from taking action against particular businesses based on those regulations — such as a hearing before the city council concerning whether to grant a particular ... license. The latter, like decisions to deny building permits or the approval of specific site plans, would be an application of policy to a specific person and would not be subject to absolute immunity.”
Grider v. City of Auburn, 628 F.Supp.2d 1322, 1336 (M.D.Ala.2009) (emphasis added except where otherwise indicated). “Acts of zoning enforcement rather than rule-making are not legislative.” Crymes v. DeKalb County, 923 F.2d 1482, 1485-86 (11th Cir.1991)(emphasis added) (county commissioners who voted to deny a permit for the development of a landfill were not entitled to legislative immunity, because denial of the permit was the “application of policy to a specific party”); see also Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal, 865 F.2d 77, 79 (4th Cir.1989) (“when municipal officials ‘do more than adopt prospective, legislative-type rules and take the next step into the area of enforcement,’ ” they cannot claim legislative immunity).
Thus, in Corn v. City of Lauderdale Lakes, 997 F.2d 1369 (11th Cir.1993), which was a “zoning dispute between the City of Lauderdale Lakes, Florida, and a [real estate] developer,” 997 F.2d at 1371, the court held that members of the city council who voted not only to rezone the developer’s property to prohibit the developer’s proposed construction of mini-warehouses on the property, but also to deny the developer’s site plan were entitled to legislative immunity for voting to rezone the property but were not so entitled for voting to deny the site plan. 997 F.2d at 1392. According to the court, the denial of the site plan, like the denial of a development permit in Crymes, supra, “involved the application of a general policy to a specific party under specific facts.” 997 F.2d at 1393.
Unlike the enactment of zoning Ordinance no. 2004-284 in this case, which was a legislative function, the denial of Vulcan Materials’ business-license application on the basis of that ordinance was an enforcement function. Simpson admits that he was directly involved in that enforcement process. Thus, although he is entitled to absolute immunity for his role in the passage of Ordinance no. 2004-284, he is not so entitled for his role in the application of that ordinance to specific parties such as Vulcan Materials. Consequently, Simpson and the Town have not demonstrated a clear, legal right to a summary judgment on the basis of legislative immunity[1] for Simpson’s acts in denying Vulcan Materials’ business-license application.

III. Conclusion

In summary, M & N has standing to sue. Therefore, to the extent that the *31 petitions of Simpson and the Town are grounded on an alleged lack of standing, they are denied. However, the Noerr-Pennington doctrine affords Simpson absolute immunity for his pre-election conduct opposing the rock quarry. Also, Simpson is entitled to absolute legislative immunity for his post-election participation in the passage of zoning Ordinance no. 2004-284. As to these immunity bases for the entry of a summary judgment, the petitions of Simpson and the Town are granted and writs are issued.
Simpson is not, however, entitled to legislative immunity for his role in denying Vulcan Materials’ application for a business license. To extent the petitions of Simpson and the Town assert legislative immunity as the basis for the entry of a summary judgment against M & N on its claim arising out of the denial of Vulcan Materials’ license application, the petitions are denied.
1080981 — PETITION GRANTED IN PART AND DENIED IN PART; WRIT ISSUED.
1081027 — PETITION GRANTED IN PART AND DENIED IN PART; WRIT ISSUED.
COBB, C.J., and SMITH, PARKER, and SHAW, JJ., concur.

. Absolute legislative immunity is the only species of immunity asserted by Simpson and the Town regarding liability for the post-election events of which M & N complains. Therefore, it is the only species of immunity we consider in this part of our opinion.