Filed 10/23/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SAVE OUR BIG TREES,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SANTA CRUZ et al.,<br><br>Defendants and Respondents. | H041136<br>(Santa Cruz County<br>Super. Ct. No. CV178084) |

In 1976, the City of Santa Cruz (City) sought to protect its urban forest by adopting the "Heritage Tree Ordinance," which governs the protection of large trees and trees having other significance. The City later adopted the "Heritage Tree Removal Resolution," which governs the removal of heritage trees. In 2013, the City amended its Heritage Tree Ordinance and Heritage Tree Removal Resolution. The City concluded that these amendments (the Project) were categorically exempt from the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] because they assured the "maintenance, restoration, enhancement, and protection" of natural resources and the environment.

Plaintiff Save Our Big Trees contends the amendments weakened existing heritage tree protections such that the Project is not exempt from CEQA. Plaintiff sought a writ of mandate directing the City to set aside its amendments for failure to comply with CEQA. Plaintiff appeals from a judgment denying its writ petition.

---

[1] Unspecified statutory references are to the Public Resources Code.

We find the City had the burden to demonstrate with substantial evidence that the Project falls within a categorical exemption to CEQA. The City failed to meet that burden. Therefore, we reverse and direct the trial court to issue a writ of mandate requiring the City to set aside the 2013 amendments to the Heritage Tree Ordinance and Heritage Tree Removal Resolution.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### *A. The Heritage Tree Ordinance*

Protection of heritage trees in the City began with the 1976 adoption of the Heritage Tree Ordinance, which established a permit process governing the preservation of heritage trees. In 1976, the Heritage Tree Ordinance defined "heritage tree" to mean "[a] tree which has a trunk with a circumference of fifty (50) inches . . . or more measured at twenty-four (24) inches above natural grade" or "[a] tree or grove of trees designated by resolution of the City Council to be of special historical value or of significant community benefit."

In 1989, the Heritage Tree Ordinance's protections were extended to "heritage shrub," and "heritage tree" was redefined to include those trees with horticultural significance and those providing a valuable habitat. Later, "heritage tree" was again redefined as a tree "growing on public or private property within the City limits" if (1) its trunk had a circumference of at least 44 inches; (2) it had "historical significance" for reasons "including but not limited to" the fact that it was commemorative, planted during a particularly significant historical era, or marked the spot of a historical event; or (3) it had "horticultural significance" for reasons "including but not limited to" the fact that it was "[u]nusually beautiful or distinctive," relatively old, of distinctive size or structure, a rare or unusual species for the area, provided a valuable habitat, or had been "[i]dentified by the City Council as having significant arboricultural value to the citizens of the City."

### *B*. *The Heritage Tree Removal Resolution*

In 1998, the City adopted the Heritage Tree Removal Resolution (resolution No. NS-23,710), which established the "only circumstances" in which a heritage tree or shrub could be "altered or removed." Those circumstances were: "(1) The heritage tree or heritage shrub has, or is likely to have, an adverse effect upon the structural integrity of a building, utility, or public or private right of way; [¶] (2) The physical condition or health of the tree or shrub, such as disease or infestation, warrants alteration or removal; or [¶] (3) A construction project design cannot be altered to accommodate existing heritage trees or shrubs."

### *C*. *The Project*

On October 22, 2013, the city council approved amendments to the Heritage Tree Ordinance (ordinance No. 2013-18). The city council also adopted amendments to the Heritage Tree Removal Resolution (resolution No. NS-28,706).[2] We refer to these actions collectively as the Project, as the parties agree the revisions constitute a "project" to which CEQA applies unless it is exempt. (See *San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist*. (2006) 139 Cal.App.4th 1356, 1373 (*San Lorenzo*); §§ 21065, 21080.)

#### *1*. *The Heritage Tree Ordinance Amendments*

The City amended the Heritage Tree Ordinance in various ways, including the addition of a "purpose" section. Among other things, that section states that the purpose of the Heritage Tree Ordinance is "to recognize, protect, optimize and responsibly manage the community urban forest." It also identifies ways in which trees "contribute

[2] The City also amended a number of related ordinances and resolutions, including an ordinance governing the trimming and removal of trees on public property and a resolution establishing fees for permits to perform work affecting heritage trees. However, plaintiff challenges only the amendments to the Heritage Tree Ordinance and the Heritage Tree Removal Resolution.

beneficially to the urban environment and . . . to . . . the state's climate action goals," including by "reduc[ing] heat buildup, noise and air pollutants"; "improv[ing] air quality, reduc[ing] particulates, . . . provid[ing] oxygen"; and "providing erosion control."

As amended, the Heritage Tree Ordinance (section 9.56.020) requires the establishment of replanting requirements and deadlines for heritage tree alterations and removals. The prior version of the Heritage Tree Ordinance required the establishment of more general "mitigation requirements" and did not mention deadlines.

The Heritage Tree Ordinance amendments revised the definition of "heritage tree" in a number of ways, three of which are relevant here. First, the amendments eliminated references to (and protection of) shrubs. Second, the amendments provided trees can acquire the "heritage" designation because of their historical significance only if "designated by City Council Resolution as having historical significance, or listed on an approved City Area Planning Document or designated for protection through an approved zoning entitlement." Third, the amendments provided trees can acquire the "heritage" designation because of their horticultural significance only if "designated by City Council Resolution as having horticultural significance."

The prior Heritage Tree Ordinance (section 9.56.050) prohibited property owners from allowing specified conditions to exist because they may be harmful to heritage trees. The amendments added a new prohibited condition--"[p]hysically damaging any heritage tree by way of topping, over-pruning, girdling, root loss, or poisoning of the heritage tree, or any action which may cause death, destruction or injury to the heritage tree or which places the heritage tree in a hazardous condition or in an irreversible state of decline."

The amendments also enacted various revisions to the Heritage Tree Ordinance's penalty provisions (section 9.56.110), including the addition of a provision allowing the City to deny a property owner who has violated the Heritage Tree Ordinance any development approval or permit until all penalty fines and damages related to the violation are paid and replanting requirements are fulfilled.

### *2. The Heritage Tree Removal Resolution Amendments*

The City amended the Heritage Tree Removal Resolution's standards for the alteration or removal of heritage trees in two relevant ways.

First, it removed the provision allowing for removal of a heritage tree that "has, or is likely to have, an adverse effect upon the structural integrity of a building, utility, or public or private right of way" and replaced it with a provision allowing for removal of a heritage tree that "has created or is likely to create an unreasonable and substantial hardship for a public or private property owner, such as excessive degradation or damage to real property, an unreasonable financial or economic burden, or an adverse effect on personal health such as allergies or physical mobility."

Second, the City introduced additional circumstances under which heritage non-native invasive trees may be removed. The amended Hertiage Tree Ordinance defines "non-native invasive species" as "any blue gum eucalyptus . . . or acacia species growing within the city limits of Santa Cruz." Under the amended Heritage Tree Removal Resolution, two or more non-native invasive heritage trees growing on a single parcel outside of a biotic resource area may be removed if: "(i) removal is required for defensible space clearance; [¶] (ii) [the] trees are poorly structured or overcrowded; [¶] (iii) [the] tree(s) are likely to cause personal injury or an unreasonable and substantial hardship for a public or private property owner; or [¶] (iv) [the] trees are likely to be invasive and outcompete native vegetation." Two or more non-native invasive heritage trees growing on a single parcel inside of a biotic resource area[3] may be removed if one

[3] For purposes of the amended Heritage Tree Removal Resolution, "biotic resource area" means biotic resource area "as defined in the City's General Plan or protected by the City's Zoning Ordinance, SCMC (Santa Cruz Municipal Code) Title 24, including designated riparian corridors, regulated slope areas and/or within areas requiring a coastal permit within the State Coastal Zone."

of those four circumstances is satisfied *and* “a qualified biologist . . . [confirms] that removal or significant alteration will not adversely impact or degrade existing habit.”

***C. Administrative Proceedings***

The City’s parks and recreation commission (the Commission) began considering changes to the Heritage Tree Ordinance after the position of urban forester was reduced from a full-time position to a three-quarter position in early 2009. With the goal of reducing the urban forester’s workload, the parks and recreation staff (Staff) recommended excluding from the Heritage Tree Ordinance heritage shrubs and non-native invasive species (blue gum eucalyptus and acacia) living outside the biotic resource area. The Commission created a subcommittee to consider amendments to the Heritage Tree Ordinance.

In addition to excluding non-native invasive species living outside the biotic resource areas from the Heritage Tree Ordinance, the subcommittee recommended eliminating or revising the provisions designating trees with historical or horticultural significance as heritage trees. The latter recommendation was based on the subcommittee’s view that those subdivisions were subjective. Staff opposed the latter recommendation and opined that “[t]he change would . . . trigger a need for further review and approvals including CEQA and an environmental determination.”[4] The subcommittee’s proposed revisions were discussed at a May 2009 commission meeting. At that meeting, the City fire chief spoke in support of excluding non-native invasive species from the Heritage Tree Ordinance due to the fire hazard those species pose.

The Commission considered revising the Heritage Tree Ordinance at two additional meetings in 2009; it next addressed the issue in November 2011. At that time,

---

[4] Staff’s use of the phrase “the change” renders its comment ambiguous. It is unclear whether Staff believed only eliminating the historical and horticultural significance provisions would require CEQA review or if it believed merely revising those provisions also would trigger CEQA.

Staff opined that the proposed exclusion of non-native invasive species living outside biotic resource areas from the Heritage Tree Ordinance "would trigger significant environmental review and possibly an EIR [(environmental impact report)]."

In June 2012, Staff informed the Commission it would cost $52,000 to perform "a defensible environmental review" of the proposal to exclude non-native invasive trees from the Heritage Tree Ordinance because the City would need to determine the "number of non-native trees that could hypothetically be removed." Staff recommended the Commission not move forward with the proposed exclusion of non-native invasive species from the Heritage Tree Ordinance. The Commission disagreed, electing to retain the proposed provision excluding non-native invasive species from the Heritage Tree Ordinance's definition of heritage tree.

Accordingly, Staff devised what it described as "an alternative approach to include the removal of heritage size non-native invasive species that satisfies environmental review requirements." Rather than excluding non-native invasive trees from the definition of heritage trees in the Heritage Tree Ordinance, Staff proposed amending the Heritage Tree Removal Resolution to allow for the removal of non-native invasive heritage trees growing outside biotic resource areas and those growing inside biotic resource areas with confirmation from a qualified biologist that removal would not adversely impact or degrade existing habitats. Staff also proposed amending the Heritage Tree Removal Resolution to permit the removal of a heritage tree that "has created or is likely to create an unreasonable and substantial hardship for a private property owner such as, excessive degradation or damage to real property, an unreasonable financial or economic burden, or an adverse effect on personal health such as allergies or physical mobility." Staff characterized the later proposed revision as giving "Commissions and City Council . . . increased discretion."

Staff concluded that, as modified, the Project was exempt from CEQA under the categorical exemptions set forth in sections 15307 and 15308 of the CEQA guidelines

(Guidelines).[5] Those exemptions apply to actions taken to assure the maintenance, restoration, or enhancement of a natural resource or the environment. (CEQA Guidelines, §§ 15307, 15308.) In support of that conclusion, Staff noted that while the proposed revisions to the Heritage Tree Removal Resolution "may allow for the removal of additional non-native trees," they "would not necessarily have the potential for causing a cumulative impact or significant effect on the environment" because "[t]he City is not requiring the removal of non-native invasive tree species[,] . . . [and] removing large trees is frequently financially limiting [such that] it is unlikely that the probability of large numbers of trees being removed would increase."

On January 14, 2013, the Commission voted to recommend the proposed Heritage Tree Ordinance amendments and the Heritage Tree Removal Resolution amendments to the city council.

The city council considered the Project at its September 24, 2013 meeting. At that meeting, the City's urban forester explained that blue gum eucalyptus and acacia trees are considered invasive because "[t]hey can out compete native habitats, and they are very prolific about propagating." She also noted that those species "can contribute to dangerous fire conditions because of the fuel load that's produced by these trees, the rate of growth, the fact that the embers can . . . smolder on the leaves and start new fires." Members of the public spoke at the meeting, including an individual representing plaintiff, who argued CEQA review was necessary. Those who opposed the Project largely expressed the view that it would be too easy to cut down heritage trees under the proposed revised scheme. They said blue gum eucalyptus trees benefit the environment

[5] The term "CEQA Guidelines" refers to the regulations for the implementation of CEQA authorized by the Legislature (Pub. Resources Code, § 21083), codified in title 14, section 15000 et seq. of the California Code of Regulations, and "prescribed by the Secretary of Resources to be followed by all state and local agencies in California in the implementation of [CEQA]." (CEQA Guidelines, § 15000.)

by serving as wind breaks; providing habitats for butterflies, birds, and other wildlife; and removing carbon dioxide from the air. Those who spoke in favor of the Project addressed their desire to remove blue gum eucalyptus trees because they crowd out native plants and trees and generate a significant amount of debris, making them difficult to maintain and a fire hazard. The fire chief spoke about the fire danger associated with eucalyptus trees. He explained that "[t]he big issues with the eucalyptus are the litter and the volume of litter beneath the tree that doesn't get cleaned up. And when that catches fire, it burns very hot, and it's very oily." With respect to defensible space, the fire chief explained that the concern generally is not with removing trees but with "cleaning out the undergrowth."

Also on September 24, 2013, counsel representing plaintiff sent the city council a letter arguing the Project was not exempt from CEQA and a letter from Travis Longcore, Ph.D., a geographer, ecologist, and professor of bioresource management, environmental impact analysis, field ecology, and environmental science. In his letter to the city council, Dr. Longcore opined that the Project would result in the removal of trees and shrubs, which could lead to the destruction of bird nests and could impact storm water runoff, carbon sequestration, and energy consumption. He also noted that eucalyptus trees provide a habitat for butterflies and birds.

At an October 22, 2013 meeting, the city council again considered the Project. Staff presented three options for amending the Heritage Tree Removal Resolution. Option No. 1 was Staff's original proposal. It included "changing [the] restrictions for non-native invasive trees" and "a damage or a hardship clause" permitting the removal of a heritage tree that has "created, or is likely to create an unreasonable and substantial hardship for private property owners such as excessive damage or degradation of property, unreasonable financial or economic burden, or an adverse effect on personal health such as allergies and physical mobility." Option No. 2 was "almost identical to the existing policy," but was a "little bit broader," according to the urban forester. It did not

include the additional criteria allowing for the removal of non-native invasive trees, "so blue gum and acacia would be treated as any other heritage tree," and it did not allow for the removal of a heritage tree based on unreasonable financial or economic burden. Option No. 3, described as "a compromise" between options Nos. 1 and 2, included the additional criteria allowing for the removal of non-native invasive trees, but did not allow for heritage tree removal due to unreasonable financial or economic burden.

With respect to the CEQA issue, one councilmember, who ultimately voted against the Project, stated: "I guess what I'm thinking about this is that it's a weird sort of circular thing because for me, the only reason to change the ordinance is to allow people to cut down trees more, you know, if we want to prioritize human uses, whether it's allergies, or protecting property, or whatever. And I think that's a reasonable thing to do. I mean, you know, that's a reasonable judgment call on the part of the Council and the community. [¶] But then I understand that if we're allowing more people to cut down more trees, that we're in trouble with the Environmental Quality Act. So, you know, I feel kind of stuck."

The city council approved the Heritage Tree Ordinance amendments and option No. 1 for amending the Heritage Tree Removal Resolution. The city council adopted and approved Staff's determination that the Project was exempt from CEQA.

The City filed a notice of exemption from CEQA on October 24, 2013.

### ***D*. *Judicial Proceedings***

Plaintiff filed a petition for writ of mandate on November 1, 2013. The trial court denied the petition, ruling that substantial evidence supported the city council's determination that the Project was exempt under CEQA Guidelines sections 15307 and 15308, and entered judgment in favor of the City. Plaintiff timely appealed.

## II. DISCUSSION

### *A*. *Overview of CEQA*

" '[T]he overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing environmental damage.' " (*Save Our Carmel River v. Monterey Peninsula Water Management Dist*. (2006) 141 Cal.App.4th 677, 687.) The statute and its implementing regulations, the CEQA Guidelines, "prescribe[] review procedures a public agency must follow before approving or carrying out certain projects." (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1091-1092 (*Berkeley*).)

CEQA review procedures can be viewed as a " 'three-tiered process.' " (*San Lorenzo, supra*, 139 Cal.App.4th at p. 1372.) The first tier requires an agency to conduct a preliminary review to determine whether CEQA applies to a proposed project. (*Ibid*.) If CEQA applies, the agency must proceed to the second tier of the process by conducting an initial study of the project. (*Id*. at p. 1373.) Among the purposes of the initial study is to help "to inform the choice between a negative declaration and an environmental impact report (EIR)." (*Ibid*.) If there is "no substantial evidence that the project or any of its aspects may cause a significant effect on the environment," the agency prepares a negative declaration. (Guidelines, § 15063, subd. (b)(2).) Alternatively, if " 'the initial study identifies potential significant effects on the environment but revisions in the project plans "would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur" and there is no substantial evidence that the project as revised may have a significant effect on the environment, a mitigated negative declaration may be used.' " (*Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1101.) Finally, if the initial study uncovers "substantial evidence that any aspect of the project, either individually or cumulatively, may cause a significant effect on the environment" (CEQA Guidelines, § 15063, subd.

(b)(1)), the agency must proceed to the third tier of the review process and prepare a full EIR. (*San Lorenzo*, *supra*, at p. 1373.)

This case concerns the first tier of review--whether the Project is subject to CEQA review. Several categories of projects are statutorily exempt from CEQA review for policy reasons. (*Berkeley*, *supra*, 60 Cal.4th at p. 1092, citing § 21080, subd. (b)(1)-(15).) Other classes of projects are " 'categorically exempt' " from CEQA review because the Secretary of the Natural Resources Agency " 'has found' . . . [they] 'do not have a significant effect on the environment.' " (*Berkeley*, *supra*, 60 Cal.4th at p. 1092; CEQA Guidelines, § 15300; § 21084, subd. (a).)

Among the categorical exemptions is the class 7 exemption for "actions taken by regulatory agencies as authorized by state law or local ordinance to assure the maintenance, restoration, or enhancement of a natural resource where the regulatory process involves procedures for protection of the environment." (CEQA Guidelines, § 15307.) Another categorical exemption, the class 8 exemption, is very similar; it exempts "actions taken by regulatory agencies, as authorized by state or local ordinance, to assure the maintenance, restoration, enhancement, or protection of the environment where the regulatory process involves procedures for protection of the environment." (*Id*., § 15308.)

"[A categorical] exemption can be relied on only if a factual evaluation of the agency's proposed activity reveals that it applies." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com*. (2007) 41 Cal.4th 372, 386.) "[T]he agency invoking the [categorical] exemption has the burden of demonstrating" that substantial evidence supports its factual finding that the project fell within the exemption. (*Ibid*.)

***B*. Standard of Review**

"When faced with a challenge to an agency's exemption determination, the court considers whether the agency proceeded in the manner required by law and whether its determination is supported by substantial evidence." (*San Lorenzo*, *supra*, 139

Cal.App.4th at p. 1381.) The interpretation of an exemption presents a question of law subject to our independent review. (*Id*. at pp. 1382, 1387.) "But 'the substantial evidence test governs our review of the [agency's] factual determination that a project falls within a categorical exemption.' " (*Id*. at p. 1382.)

In the CEQA context, substantial evidence "means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (CEQA Guidelines, § 15384, subd. (a).) Substantial evidence includes "facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts" (*id*., subd. (b)), but not "[a]rgument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment." (*Id*., subd. (a).)

***C. The Scope of the Class 7 and Class 8 Exemptions***

Our first task is to independently interpret the class 7 and class 8 exemptions.[6] Specifically, at issue here is the meaning of the phrase "actions . . . to assure the maintenance, restoration, or enhancement" as it is used in those exemptions.

---

[6] The two exemptions, set forth in full below, are nearly identical. Class 7 applies actions to assure the maintenance, restoration, or enhancement of a *natural resource*; class 8 applies actions to assure the maintenance, restoration, enhancement, or *protection* of the *environment*. For simplicity, we consider the exemptions together, asking whether the Project constitutes an action "to assure the maintenance, restoration, or enhancement" of the environment.

The class 7 exemption provides, in full: "Class 7 consists of actions taken by regulatory agencies as authorized by state law or local ordinance to assure the maintenance, restoration, or enhancement of a natural resource where the regulatory process involves procedures for protection of the environment. Examples include but are not limited to wildlife preservation activities of the State Department of Fish and Game. Construction activities are not included in this exemption." (CEQA Guidelines, § 15307.)

(continued)

Case law is instructive as to which actions fall within these exemptions, and which do not. The prohibition of an activity that evidence shows is associated with "environmental problems, [such as] the contamination of farmland," constitutes an action to assure "protection of the environment." (*Magan v. County of Kings* (2002) 105 Cal.App.4th 468, 476 [ordinance phasing out "the land application of sewage sludge" fell within class 8 exemption].) By contrast, actions that remove existing wildlife protections, authorize and regulate hunting, or relax existing environmental safeguards do not assure the maintenance, restoration, or enhancement of the environment. (See *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 125 (*Mountain Lion*) [action that "removes rather than secures . . . protections [of animal species]" does not fall within class 7 or class 8 exemption]; *Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 205 (*Chickering*) [setting of hunting seasons does not fall within class 7[7] exemption because such an action "cannot fairly or readily be characterized as a *preservation activity* in a strict sense"]; *International Longshoremen's & Warehousemen's Union v. Board of Supervisors* (1981) 116 Cal.App.3d 265, 276 (*International Longshoremen's*) [amendment doubling the allowable emissions of gases the Legislature has determined are dangerous substances did not fall within class 7 or class 8 exemption[8]].)

---

The class 8 exemption provides, in full: "Class 8 consists of actions taken by regulatory agencies, as authorized by state or local ordinance, to assure the maintenance, restoration, enhancement, or protection of the environment where the regulatory process involves procedures for protection of the environment. Construction activities and relaxation of standards allowing environmental degradation are not included in this exemption." (CEQA Guidelines, § 15308.)

[7] *Chickering* involved a prior version of the class 7 exemption that was substantially similar to the current class 7 exemption. (*Chickering*, *supra*, 18 Cal.3d at p. 204; CEQA Guidelines, § 15307.)

[8] *International Longshoremen's* applied prior versions of the class 7 and class 8 exemptions that were substantially similar to the current class 7 and class 8 exemptions.
(continued)

These legal guideposts indicate that, consistent with its plain language, the phrase "actions . . . to assure the maintenance, restoration, or enhancement" embraces projects that combat environmental harm, but not those that diminish existing environmental protections. The parties acknowledge as much, recognizing that the Project is exempt only if it does not weaken existing heritage tree protections. However, as discussed below, they dispute how this court should determine the Project's impact.

### *D. Substantial Evidence Does Not Support the City's Determination That the Project is Categorically Exempt From CEQA*

According to the City, we must look at the Project "as a whole" to determine whether it will strengthen or weaken existing heritage tree protections. By contrast, plaintiff argues that if the Project will have any "unfavorable" impact on a natural resource or the environment then it is not exempt, regardless of whether it will also have other, "favorable" impacts.

The CEQA Guidelines' definition of "project" as meaning "the whole of an action" appears to provide at least some support for the City's view that only the Project's overall impact matters. (CEQA Guidelines, § 15378.) However, the City does not cite to that provision, nor to any other authority, to support its position. Plaintiff relies on the Supreme Court's conclusion in *Chickering* that the class 7 exemption did not apply to an action with "the potential for a significant environmental impact, both favorable and unfavorable." (*Chickering, supra*, 18 Cal.3d at p. 206 ["[w]hen the impact [of a project] may be either adverse or beneficial, it is particularly appropriate to apply CEQA which is carefully conceived for the purpose of increasing the likelihood that the environmental effects will be beneficial rather than adverse"].) But, in *Berkeley*, the Supreme Court distanced itself from that portion of *Chickering*, describing it as

---

(*International Longshoremen's, supra*, 116 Cal.App.3d at p. 276; CEQA Guidelines, §§ 15307, 15308.)

"unnecessary to resolve the case . . . [and] summary." (*Berkeley*, *supra*, 60 Cal.4th at p. 1107.)

We need not decide which approach is correct. Even if we consider the full complement of revisions together, as the City urges, substantial evidence does not support the City's determination that the Project constitutes an action "to assure the maintenance, restoration, or enhancement" of the environment for the reasons discussed below. We begin by discussing each aspect of the Project separately, before addressing whether--taken together--they strengthen or weaken existing heritage tree protections.

*1. The Heritage Tree Ordinance Amendments*

With respect to the Heritage Tree Ordinance amendments, the City concedes that the revisions mean trees can no longer be designated as heritage "based on little more than a whim," such as a person's decision to plant a tree as a "commemorative" to a deceased pet. Instead, as revised, the Heritage Tree Ordinance requires a city council resolution before a tree can acquire the "heritage" designation because of its historical or horticultural significance. According to the City, "[r]eplacing subjective standards with objective and scientific criteria does not weaken tree protections." But the implication of the City's own brief is that, under the amended Heritage Tree Ordinance, a "commemorative" tree planted for a deceased pet will not acquire heritage tree protection. Thus, the Heritage Tree Ordinance amendments remove protection from such trees, much like the delisting at issue in *Mountain Lion* removed protection for Mojave ground squirrels.

The City emphasizes that other revisions to the Heritage Tree Ordinance strengthen the protection of heritage trees. For example, the Heritage Tree Ordinance amendments require the imposition of deadlines for the planting of new trees when a heritage tree is removed; add new restrictions on the treatment of heritage trees to protect them from death, destruction, or injury; and add additional penalties for property owners who violate the Heritage Tree Ordinance. Other revisions merely clarify the Heritage

Tree Ordinance, the City points out. For instance, as revised, the Heritage Tree Ordinance specifies that measuring standards defined by the International Society of Arboriculture should be used in determining whether a tree meets the heritage tree size requirement.

*2. The Heritage Tree Removal Resolution Amendments*

The Heritage Tree Removal Resolution amendments made two significant changes to the City's heritage tree scheme. First, the amendments introduced new justifications for removing any heritage tree, including that the tree "has created or is likely to create . . . an unreasonable financial or economic burden [on a public or private property owner]" or "has created or is likely to create . . . an adverse effect on [the] personal health [of a public or private property owner] such as allergies or physical mobility." The urban forester and city council members recognized that these new justifications relaxed the limitations on removing heritage trees. The urban forester explained that her ability to consider a particular heritage tree removal permit application would be "broader" under the amended Heritage Tree Removal Resolution because she could "consider unreasonable financial or economic burdens." One councilmember described the new justifications as "allow[ing] people to cut down trees more" and "prioritiz[ing] human uses, whether it's allergies, or protecting property, or whatever." Another councilmember characterized the resolution as "loosening" the heritage tree removal criteria.

Second, the amended Heritage Tree Removal Resolution introduced additional justifications for removing two or more non-native invasive heritage trees growing on a single parcel. For example, the amended Heritage Tree Removal Resolution permits the removal of two or more non-native invasive heritage trees growing on a single parcel outside of a biotic resource area if the trees "are likely to be invasive and outcompete native vegetation." Record evidence shows non-native invasive heritage trees are, by definition, invasive because they outcompete native vegetation. As Staff explained to the

city council in a June 2013 agenda report, acacia and blue gum eucalyptus trees "were isolated because they grow at a high rate of speed and can spread prolifically, out-competing the vegetation in native habitats." Accordingly, the amended Heritage Tree Removal Resolution appears to effectively remove heritage tree protection from groves of non-native invasive trees growing outside of a biotic resource area. One councilmember reached the same conclusion, noting that the resolution "lists [as] one of the criterions for cutting down presumably the entire grove [of eucalyptus] . . . that trees are likely to be invasive and out compete native vegetation. [¶] Well, the trees have already been described as non-native invasive trees, so it would appear purely on the [resolution] . . . that any of the non-native invasive trees could be cut down based on being invasive and non-native because by definition they're invasive and non-native."

The amended Heritage Tree Removal Resolution expands opportunities to cut down protected trees. Stated differently, it relaxes existing protections for heritage trees, just as the amendment at issue in *International Longshoremen*'*s* relaxed emissions standards. Both the amended Heritage Tree Removal Resolution's plain language and the record evidence discussed above support that conclusion.

The City does not deny that the amended Heritage Tree Removal Resolution allows for the removal of heritage trees in circumstances where removal was not previously permitted. Instead, the City argues that its intent is not to "*encourage*" tree removal. But that is irrelevant. In *Mountain Lion*, the Fish and Game Commission did not encourage the killing of Mojave ground squirrels, it merely took the species off the threatened species list. Nevertheless, our Supreme Court concluded that, because the action "remove[d] rather than secure[d] . . . protections, the categorical exemption for actions assuring the maintenance, preservation or enhancement of a natural resource set forth in sections 15307 and 15308 of the Guidelines [did] not apply." (*Mountain Lion*, *supra*, 16 Cal.4th at p. 125.) Likewise, in *Chickering* the Fish and Game Commission did

not encourage the hunting of black bears, it merely allowed it, an action held not to be exempt.

The City further argues that, in practice, the amended Heritage Tree Removal Resolution will not result in more heritage tree removals because (1) an applicant must file an application for a heritage tree removal permit (the granting of which is subject to appeal), (2) the urban forester stated she will continue to evaluate removal permit applications from an arboricultural and fact-based perspective, and (3) tree removal is costly. The City goes so far as to suggest the revisions it spent years formulating were not necessary. In support of its argument, the City notes plaintiff has not cited any evidence that the amended Heritage Tree Removal Resolution will "encourage or require the removal of any one particular tree or group of trees" or that such removal would "constitute a significant environmental impact."

We are unpersuaded by this attempt to cloak the amended Heritage Tree Removal Resolution with the protection of the class 7 and class 8 exemptions for three reasons.

First, because the City is invoking the class 7 and class 8 exemptions, it bears the burden to demonstrate with substantial evidence that the Project constitutes an action to assure the maintenance, restoration, or enhancement of the environment. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.*, *supra*, 41 Cal.4th at p. 386.) Plaintiff bears no burden to show the Project will degrade the environment or deplete a natural resource, as the City implies.

Second, the question before us is not whether the Project will have a significant effect on the environment but whether substantial evidence supports the determination that it will assure the maintenance, restoration, or enhancement of the environment. In the past, our Supreme Court appeared to suggest that whether a project is categorically exempt turns on whether it may have a significant effect on the environment. For instance, in *Chickering*, the court noted that because "[t]he secretary is empowered to exempt only those activities which do not have a significant effect on the environment"

(*Chickering*, *supra*, 18 Cal.3d at p. 205), "[i]t follows that where there is any reasonable possibility that a project or activity may have a significant effect on the environment, an exemption would be improper." (*Id.* at p. 206.) The court echoed that point in *Mountain Lion*, stating "a categorical exemption represents a determination by the Secretary that a particular project does not have a significant effect on the environment"; "[i]t follows that an activity that may have a significant effect on the environment cannot be categorically exempt." (*Mountain Lion*, *supra*, 16 Cal.4th at p. 124.) However, the court recently characterized those statements as "tangential," "unnecessary," and "summary." (*Berkeley*, *supra*, 60 Cal.4th at pp. 1107, 1109.) The *Berkeley* majority rejected the contention that "a showing of a fair argument of a potential environmental effect precludes application of all categorical exemptions." (*Id.* at p. 1102.) Thus, under *Berkeley*, whether the Project will have a significant effect on the environment is not the standard for determining whether it falls within a categorical exemption. Here, the standard is whether substantial evidence supports the determination that the Project will assure the maintenance, restoration, or enhancement of the environment. Even assuming the amended Heritage Tree Removal Resolution will not actually result in additional tree removals (despite allowing for them), that does not render it an action to assure the maintenance, restoration, or enhancement of the environment.

Third, to the extent the number of likely tree removals is relevant, the City has failed to show the amended Heritage Tree Removal Resolution will not increase that number. Common sense dictates that permits to remove heritage trees under the circumstances introduced by the amended Heritage Tree Removal Resolution can and will properly be granted by the urban forester. As one councilmember put it, "if you're going to cut down trees because of allergies, then you're going to have more trees cut down because that's different from how it was before. So, you know, whether we think that's a good idea or not, in terms of trying to figure out whether it would result in more trees being cut down, that seems pretty clear." And members of the public expressed a

desire to remove heritage blue gum eucalyptus trees at the city council meeting; it would be speculative to conclude they cannot afford to do so. (CEQA Guidelines, § 15384, subd. (a) [substantial evidence does not include speculation].)

#### 3. *The City Failed to Carry its Burden to Demonstrate the Project is an Action to Assure the Maintenance, Preservation, or Enhancement of the Environment*

Viewed "on the whole," as the City says is proper, the Project (1) removed heritage tree protection from certain trees, (2) expanded opportunities to cut down protected heritage trees, and (3) strengthened the protection of those trees that continue to qualify as heritage and are not subject to removal. In other words, it enacted a scheme that protects fewer heritage trees more effectively. "Because [the Project] removes rather than secures . . . protections" from some undefined number of heritage trees, "the categorical exemption[s] for actions assuring the maintenance, preservation or enhancement of a natural resource [or the environment] set forth in sections 15307 and 15308 of the Guidelines do[] not apply." (*Mountain Lion*, *supra*, 16 Cal.4th at p. 125.)

The City's replanting requirement--under which every heritage tree removed with City approval must be replaced by three 15 gallon trees or one 24 inch size boxed specimen tree--does not alter our conclusion. The City identifies no evidence that those replacement trees will contribute beneficially to the urban environment in the same way as the removed heritage tree by, for example, storing the same amount of carbon.

Accordingly, the City has failed to carry its burden to demonstrate with substantial evidence that the Project will assure the maintenance, restoration, or enhancement of the environment. Therefore, substantial evidence does not support application of the class 7 and class 8 exemptions.

## III. DISPOSITION

The judgment is reversed. The trial court is directed to grant plaintiff's petition and to issue a writ of mandate directing the City of Santa Cruz to set aside (1) its

adoption of the Heritage Tree Ordinance amendments (ordinance No. 2013-18) and the Heritage Tree Removal Resolution amendment (resolution No. NS-28,706) and (2) its October 24, 2013 notice of exemption.  Plaintiff is awarded its costs on appeal.

Walsh, J.[*]

WE CONCUR:

Rushing, P.J.

Elia, J.

Save Our Big Trees v. City of Santa Cruz et al.
H041136

[*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | Santa Cruz County Superior Court<br>Superior Court No. CV178084 |
| Trial Judge: | Hon. Paul M. Marigonda |
| Counsel for Plaintiff/Appellant:<br>Save Our Big Trees | Wittwer Parkin<br>William P. Parkin<br>Jonathan Wittwer |
| Counsel for Defendant/Respondent:<br>City of Santa Cruz | Remy Moose Manley<br>Sabrina V. Teller<br>Jeannie Lee<br><br>Atchison, Barisone, Condotti &<br>Kovacevich<br>John G. Barisone<br>Lauren C. Valk |

Save Our Big Trees v. City of Santa Cruz et al.
H041136