**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RELEVANT GROUP, LLC, a
Delaware limited liability company;
1541 WILCOX HOTEL, LLC, a
Delaware limited liability company;
6516 TOMMIE HOTEL, LLC, a
Delaware limited liability company;
6421 SELMA WILCOX HOTEL,
LLC, a California limited liability
company,

   *Plaintiffs-Appellants*,

 v.

STEPHEN NOURMAND, AKA
Saeed Nourmand an individual;
SUNSET LANDMARK
INVESTMENT, LLC, a California
limited liability company;
NOURMAND AND ASSOCIATES, a
California corporation; DOES, 1-10,

   *Defendants-Appellees*.

No. 23-55574

D.C. No.
2:19-cv-05019-
PSG-KS

OPINION

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted June 3, 2024
Pasadena, California

Filed September 5, 2024

Before:  MILAN D. SMITH, JR. and BRIDGET S. BADE,
Circuit Judges, and SIDNEY A. FITZWATER,[*] District
Judge.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[**]

### *Noerr-Pennington* Doctrine

The panel affirmed the district court's summary judgment in favor of Defendants, property developers who operate the Hollywood Athletic Club, in an action in which Plaintiffs, rival property developers who own three hotels, alleged that Defendants abused the processes available under the California Environmental Quality Act (CEQA) to extort funds from Plaintiffs in violation of the Racketeer Influenced and Corrupt Organizations Act.

The district court held that the *Noerr-Pennington* doctrine—a rule that requires courts to construe statutes to avoid burdening conduct that implicates the Petition Clause

---

[*] The Honorable Sidney A. Fitzwater, United States District Judge for the Northern District of Texas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

of the First Amendment—protected Defendants from statutory liability for engaging in petitioning activity challenging several of Plaintiffs' proposed hotel projects using the CEQA framework.

As a threshold matter, the panel held that District Judge Gutierrez did not abuse his discretion in sua sponte reconsidering the denial of summary judgment by District Judge Wright, from whom the case was transferred before trial, where Judge Gutierrez explained how Judge Wright's decision was clearly erroneous and how manifest injustice would occur should the decision be allowed to stand.

The panel held that the district court did not err in holding that Defendants' petitioning activities were protected under the *Noerr-Pennington* doctrine. In determining whether the sham litigation exception to the doctrine applies, the district court properly applied the framework set forth in *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) (PREI) (sham litigation exception applies where a lawsuit is objectively baseless and brought with an unlawful motive). In applying the PREI framework, the district court did not err in concluding that Defendants' actions pursuant to CEQA were not objectively baseless and therefore did not fall within the sham litigation exception. The panel did not review evidence suggesting that Defendants had an improper purpose because courts may examine a litigant's subjective motivation only if the challenged litigation is objectively baseless. And because the district court correctly held that Defendants' CEQA actions did not fall within the sham litigation exception, the panel did not need to reach Defendants' other arguments in order to affirm the district court.

## COUNSEL

Amit R. Vora (argued), Jennifer S. Recine, Donald J. Reinhard, Kasowitz Benson Torres LLP, New York, New York; Daniel Saunders, Kasowitz Benson Torres LLP, Los Angeles, California; for Plaintiffs-Appellants.

Glenn A. Danas (argued) and Katelyn M. Leeviraphan, Clarkson Law Firm PC, Malibu, California; Patrick M. Maloney (argued), Gregory M. Smith, and Elizabeth T. Schaus, Maloney Firm APC, El Segundo, California; for Defendants-Appellees.

Laurence S. Zakson, Reich Adell & Cvitan, Glendale, California; Aaron G. Lawrence, Reich Adell & Cvitan, Glendale, California; Scott A. Kronland, Stacey M. Leyton, and Corinne F. Johnson, Altshuler Berzon LLP, San Francisco, California; for Amici Curiae The State Building and Construction Trades Council, Sierra Club, Natural Resources Defense Council, Communities for a Better Environment, Planning and Conservation League, California Communities Against Toxics, California State Council of Laborers, and Coalition for Clean Air.

**OPINION**

M. SMITH, Circuit Judge:

This case arises out of a dispute between two property developers and their subsidiaries: Plaintiff-Appellant Relevant Group, LLC, which owns the Wilcox, Tommie, and Selma hotels (sometimes referred to as Plaintiffs herein), and Defendant-Appellees Sunset Landmark Investment, LLC, Stephen Nourmand, and Nourmand & Associates, which operate the Hollywood Athletic Club. In their complaint, Plaintiffs allege that Defendants abused the processes available under the California Environmental Quality Act (CEQA), Pub. Res. Code §§ 21000–21189.57, to extort funds from Plaintiffs in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68. The district court granted summary judgment in favor of Defendants, holding that the *Noerr-Pennington* doctrine protected Defendants' petitioning activity from statutory liability under the First Amendment. We affirm the district court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Overview

Relevant Group, LLC is an umbrella entity that manages the three other LLC Plaintiffs—the 1541 Wilcox Hotel LLC, the 6516 Tommie Hotel LLC, and the 6421 Selma Wilcox Hotel LLC (collectively, Relevant). Relevant has spent the last decade trying to develop hotels in the Hollywood neighborhood of Los Angeles.

The historic Hollywood Athletic Club, owned by Sunset Landmark Investment LLC (Sunset) is located in the same neighborhood as Relevant's projects. Defendant Stephan

"Saeed" Nourmand is Sunset's principal. Saeed is also a founder of Defendant Nourmand and Associates (N&A), a residential real estate brokerage firm.

In 2015, Defendants began challenging Relevant's proposed hotel projects by, inter alia, opposing them during the entitlements process with the City of Los Angeles (the City) and by filing lawsuits against the City in California Superior Court pursuant to the CEQA.

## B. CEQA

CEQA "establishes a comprehensive scheme to provide long-term protection to the environment." *Berkeley Hillside Pres. v. City of Berkeley*, 343 P.3d 834, 837 (Cal. 2015). "Consistent with California's strong environmental policy, whenever the approval of a project is at issue, the statute and regulations have established a three-tiered process to ensure that public agencies inform their decisions with environmental considerations." *San Lorenzo Valley Cmty. Advocs. for Responsible Educ. v. San Lorenzo Valley Unified Sch. Dist.*, 139 Cal. App. 4th 1356, 1372 (2006) (internal quotation marks and citation omitted).

"The first tier requires an agency to conduct a preliminary review to determine whether CEQA applies to a proposed project." *Save Our Big Trees v. City of Santa Cruz*, 241 Cal. App. 4th 694, 704 (2015). "If CEQA applies, the agency must proceed to the second tier of the process by conducting an initial study of the project." *Id.*

At the second tier, the initial study is performed to determine the impact of the project on the environment and whether additional investigation must be undertaken. *Id.* at 704–05. If, per the initial study, there is "no substantial

evidence[1] that the project or any of its aspects may cause a significant effect on the environment," the agency prepares what is called a "negative declaration." *Id.* at 705 (quoting CEQA Guidelines, § 15063(b)(2)). Alternatively, if the initial study identifies potential effects on the environment that the agency nonetheless determines can be mitigated by revisions to project plans to a point where clearly no significant effect on the environment would occur, the agency issues a "mitigated negative declaration" (MND). *Id.*

Only if "the initial study uncovers 'substantial evidence that any aspect of the project, either individually or cumulatively, may cause a significant effect[2] on the environment'" does the agency proceed to the third tier of the review process, which involves preparing a full environmental impact report (EIR). *Id.* (quoting CEQA Guidelines, § 15063(b)(1)).

---

[1] "In the CEQA context, substantial evidence 'means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.'" *Save Our Big Trees*, 241 Cal. App. 4th at 705 (quoting CEQA Guidelines, § 15384 (a)).

[2] "Significant effect on the environment means a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance." *Keep Our Mountains Quiet v. County of Santa Clara*, 236 Cal. App. 4th 714, 729 (2015) (quoting CEQA Guidelines, § 15382) (internal quotation marks omitted). But "[t]here is no 'ironclad definition of what constitutes a significant effect.'" *Id.* (quoting CEQA Guidelines, § 15064 (b)) (cleaned up).

"When an agency issues a negative declaration or a mitigated negative declaration, third parties with standing[3] may seek judicial review of the adoption of the negative declaration by filing a petition for writ of mandate in a California court." *San Bernardino Valley Audubon Soc'y,* 71 Cal. App. 4th at 385. A litigant who successfully challenges an agency's issuance of a negative declaration in court may be entitled to attorneys' fees. *Friends of "B" St. v. City of Hayward*, 106 Cal. App. 3d 988, 994–95 (1980) (citation omitted).

## C. Relevant's Hotel Projects

Sunset challenged several proposed Relevant projects using the CEQA framework. Relevant alleges that Sunset brought these challenges for the sole purpose of obstructing Relevant's work and extorting funds from Relevant.

### i. The Thompson Project

In February 2015, the City issued a Notice of Public Hearing for the Thompson Hotel project (Thompson Project). A month later, the City published an initial MND for the Thompson Project, meaning that "the initial study identifie[d] potentially significant effects on the environment" but that revisions to project plans could mitigate those effects to where development would be acceptable. *Save Our Big Trees*, 241 Cal. App. 4th at 705.

---

[3] A party has standing to seek a writ of mandate in state court based on alleged CEQA violations if she is "a property owner, taxpayer, or elector who establishes a geographical nexus with the site of the challenged project." *Citizens Ass'n for Sensible Dev. of Bishop Area v. County of Inyo*, 172 Cal. App. 3d 151, 158 (1985); *see also San Bernardino Valley Audubon Soc'y v. Metro. Water Dist*., 71 Cal. App. 4th 382, 385–89 (1999).

In July of that year, the City published a revised MND for the Thompson Project, adding several new mitigation measures to address noise impacts.  Then, in September, Sunset filed objections to the Thompson Project, raising, in part, concerns about the hotel's impact on traffic and noise.  Nonetheless, on October 19, 2015, the City adopted another MND and approved the Thompson Project.  Ultimately, the City granted final approval for the Thompson Project in February 2016.  A few weeks later, Sunset filed its Petition for Writ of Mandate against the City, to challenge the Thompson Project's MND and require the City to prepare a full EIR.  As discussed below, the parties eventually reached a settlement regarding the Thompson Project.

### ii.  The Tommie Project

While the Thompson Project was underway, Relevant also proposed the Tommie Hotel project (Tommie Project).  In December 2016, the City produced an MND for the Tommie project.  A month later, Sunset filed objections regarding plans for the Tommie Project, and a month thereafter, Sunset filed an appeal challenging the approval of the Tommie Project.  The City nonetheless approved the Tommie Project on May 12, 2017.  On June 9, 2017, Sunset filed a Petition for Writ of Mandate, seeking a full EIR for the Tommie Project.

While the state court appeal was pending, Relevant and Thompson settled their disputes regarding the Thompson Project and Tommie Project on August 24, 2017, and a formal agreement was executed in January of the following year.

### iii. Selma Project

Meanwhile, Relevant was working on the Selma Hotel project (Selma Project).  In December 2017, the City published an MND for the Selma Project, and in March 2018, the City issued a Notice of Public Comment.  That month, Sunset submitted an objection letter.  The City approved the Selma Project, but Sunset promptly appealed. During the pendency of this appeal, Sunset also sent a letter to the Los Angeles County District Attorney's Office, the California Attorney's Office, the California Attorney General, and the U.S. Attorney for the Central District of California, requesting that prosecutors open an investigation into the City's approvals of Relevant projects in Hollywood.

In March 2019, the City denied all appeals related to the Selma Project.  A month later, Sunset filed a Petition for Writ of Mandate seeking a full EIR for the Selma Project.[4] On January 8, 2020, the state court issued an interlocutory order on Sunset's petition, the effects of which the parties dispute.  The Selma Project remains pending before the City.

### iv. Schrader Project

Finally, the district court discussed the Schrader Hotel project (Schrader Project).  The parties dispute the extent of Relevant's interest in the Schrader Project.   The hotel is technically being developed by a third party (KoarGroup), as opposed to Relevant, but Relevant allegedly had an ownership interest in the Schrader Project because it was a party to a purchase agreement and had made a $1 million nonrefundable down payment towards the purchase price.

---

[4] On April 4, 2019, an individual named Casey Maddren also filed a Petition for Writ of Mandate against the Selma.  There is a dispute about the extent of Maddren's ties to Defendants.

As with the other proposed projects, Sunset submitted an objection to the Schrader Project and appealed its approval, but later withdrew its challenge.  Relevant claims that Defendants ended their opposition to the Schrader Project after learning that Relevant had lost interest in the project.

In June 2019, Relevant filed a complaint in federal court bringing three RICO claims under 18 U.S.C. §§ 1962(c) and (d) against Defendants based on alleged extortion and attempted extortion relating to Defendants' petitioning activity.

Relevant's claims survived two motions to dismiss and a motion for summary judgment.  After summary judgment and before trial, however, the case was transferred from Judge Wright to Judge Gutierrez.  Judge Gutierrez sua sponte ordered supplemental briefing on the issues resolved at summary judgment before Judge Wright, and in a new order, reversed the prior determination and granted summary judgment in favor of Defendants.  Relevant timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291.  We review de novo the district court's summary judgment order. *2-Bar Ranch Ltd. P'ship v. U.S. Forest Serv.*, 996 F.3d 984, 990 (9th Cir. 2021).

## ANALYSIS

### I.   The district court did not abuse its discretion in sua sponte reconsidering the prior judge's summary judgment ruling.

As a threshold matter, Relevant argues that the law of the case doctrine, "or, at a minimum, the principles underlying the doctrine," should have precluded the district court from

sua sponte reconsidering its earlier decision denying summary judgment.

Under the law of the case doctrine, "a court is generally precluded from reconsidering an issue that has already been decided by the same court . . . in the identical case." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993). However, a second district judge may review an interlocutory order by a prior judge in the same case when "(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." *Zeyen v. Bonneville Joint Dist., #93*, --- F.4th ---, No. 23-35438, 2024 WL 3909574, at \*5 (9th Cir. Aug. 23, 2024) (quoting *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1027 (9th Cir. 2001)). In the first scenario, where there has been no intervening change in the law nor new evidence offered, the district court judge must explain "(1) why the previous decision is 'clearly erroneous'; and (2) why enforcement of the previous decision 'would work a manifest injustice.'" *Id.* (quoting *Delta Sav. Bank*, 265 F.3d at 1027). Moreover, regardless of whether a judge has committed an abuse of discretion by reviewing a prior judge's ruling, "there is nothing that insulates either judge's conclusion from appellate review." *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 687 (9th Cir. 1993); *see also Delta Sav. Bank*, 265 F.3d at 1027–28 ("[W]hether or not a district court judge abuses his discretion by reversing an earlier judge's ruling, the Court of Appeals should review the merits of the ruling.").

As discussed above, this case was originally assigned to Judge Wright, and then to Judge Gutierrez. By the time the case reached Judge Gutierrez, Judge Wright had already

denied Defendants' two motions to dismiss and motion for summary judgment.  On January 20, 2023, Judge Gutierrez vacated the trial date and ordered supplemental briefing on the issues resolved by the prior summary judgment order.  In that order, Judge Gutierrez expressed doubt regarding Judge Wright's view of the *Noerr-Pennington* doctrine and noted that "[t]he issues identified in this order are complex and important and require a second look to ensure that the law is correctly interpreted and applied. It is also in the interests of justice that these issues are clarified for the parties, the Court, and a jury should the case proceed to trial."

The parties filed their supplemental briefs.  On May 24, 2023, Judge Gutierrez granted summary judgment in favor of Defendants.  In his order, Judge Gutierrez acknowledged Relevant's objection to his sua sponte reconsideration of summary judgment, noting that a judge generally should not overrule a prior decision of another judge in the same case. However, he was "firmly convinced that the prior order is erroneous and, if upheld, would endanger core constitutional rights."

Judge Gutierrez did not abuse his discretion in reconsidering Judge Wright's denial of summary judgment. Rather, Judge Gutierrez met the *Delta Savings Bank* standard by explaining both how Judge Wright's decision was clearly erroneous (misapplication of the *Noerr-Pennington* doctrine) and how manifest injustice would occur should the prior decision be allowed to stand ("core constitutional rights" were at issue).

Moreover, Relevant's arguments that Judge Gutierrez abused his discretion are not persuasive.  It continuously characterizes Judge Wright as having rejected defendants' *Noerr-Pennington* defense "three separate times" prior to

Judge Gutierrez's reversal, thereby portraying reconsideration as highly problematic. But the first two times Judge Wright rejected defendants' arguments were on two separate motions to dismiss, filed by two separate defendants. And as this court has said, "[p]retrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case." *Peralta*, 744 F.3d at 1088. As to reconsideration of the final "time" Judge Wright rejected the argument, our court has noted that "denial of summary judgment often is reconsidered." *Id.* (citing Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, 18B Fed. Prac. & Proc.: Juris. 2d § 4478.1 (2002)). Regardless, any procedural error would be harmless. As detailed below, Judge Gutierrez's decision granting summary judgment in favor of Defendants was correct.

## II. The district court did not err in holding that Defendants' activities were protected under the *Noerr-Pennington* Doctrine.

The *Noerr-Pennington* doctrine "is a rule of statutory construction that requires courts to construe statutes to avoid burdening conduct that implicates the protections of the Petition Clause of the First Amendment." *United States v. Koziol*, 993 F.3d 1160, 1171 (9th Cir. 2021). That clause protects "the right of the people . . . to petition the government for a redress of grievances." *Id.* (quoting U.S. Const. amend. I). The doctrine originally arose in the antitrust context but has since been applied "outside the antitrust field." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 930 (9th Cir. 2006).

"Under the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their

petitioning conduct." *Id.* at 929. The classic example is *Noerr* itself, where a group of truck operators sued a group of railroad companies under the antitrust laws after the railroads began a publicity campaign to obtain legislation favoring their industry. *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 129 (1961). The Court held that the publicity campaign was protected petitioning activity, notwithstanding any underlying anticompetitive motive on the railroads' part. *Id*. at 136. We have since extended *Noerr* protection to lawsuits, noting that the doctrine "overprotects baseless petitions so as to ensure citizens may enjoy the right of access to the courts without fear of prosecution." *Sosa*, 437 F.3d at 934.

However, "neither the Petition Clause nor the *Noerr-Pennington* doctrine protects sham petitions, and statutes need not be construed to permit them." *Id.* at 932. Our court has identified three circumstances in which the sham litigation exception might apply: first, where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful, *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 54 (1993) (*PREI*); second, where the conduct involves a series of lawsuits "brought pursuant to a policy of starting legal proceedings without regard to the merits" and for an unlawful purpose, *USS–POSCO Indus. v. Contra Costa Cnty Bldg. & Constr. Trades Council*, 31 F.3d 800, 810–11 (9th Cir. 1994) (*POSCO*); and third, if the allegedly unlawful conduct "consists of making intentional misrepresentations to the court, litigation can be deemed a sham if 'a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.'" *Sosa*, 437 F.3d at 938 (quoting *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998)).

**A. The *PREI* framework rather than the *POSCO* framework applies.**

Relevant's first argument is that the district court erred by applying the test to determine whether litigation activity is a "sham" under the framework in *PREI* as opposed to that in *POSCO* (i.e., the first as opposed to the second of the three circumstances set forth above). To understand that argument, we need to consider each of these cases.

*PREI* involved a dispute between a company that owned copyrights in certain films (Columbia) and a hotel where guests could rent those films to watch in their rooms (PRE). 508 U.S. at 51–53. When Columbia sued PRE for copyright infringement, PRE counterclaimed, alleging that the copyright suit was a sham brought with the motive of monopolizing movie distribution. *Id.* at 53. The Supreme Court affirmed the district court's decision to deny discovery into Columbia's subjective motives for bringing the copyright suit, explaining that PRE first had to show that (1) the lawsuit was "objectively baseless," and only then that (2) the defendant had an improper motive in bringing the suit. *Id.* The Court ultimately held that the suit was not objectively baseless and thus immunized.

*POSCO*, unlike *PREI*, is not a Supreme Court case, but as explained below, drew its reasoning from Supreme Court precedent. In *POSCO*, a group of unions "began a campaign to eliminate non-union construction" by allegedly bringing a "series of overlapping, repetitive and sham lawsuits" against a company named BE&K, which had been awarded a construction contract but did not employ union workers. *POSCO*, 31 F.3d at 804. BE&K filed suit against the unions alleging various antitrust violations, and the unions asserted

that their activities were protected by the *Noerr-Pennington* doctrine. *Id.*

In opposing the unions' invocation of *Noerr-Pennington*, BE&K cited a Supreme Court case from 1972, *California Motor Transport Co. v. Trucking Unlimited*, where the Supreme Court held the allegations "that petitioners 'instituted the proceedings and actions . . . with or without probable cause, and regardless of the merits of the cases,'" were "[o]n their face . . . within the 'sham' exception." 404 U.S. 508, 512, 516 (1972). In response, the unions argued that *PREI*, discussed above, effectively overruled *California Motor Transport* and that the two-step analysis applied to all invocations of the "sham" exception. *POSCO*, 31 F.3d at 810.

The *POSCO* panel was "not persuaded that *Professional Real Estate Investors* effectively overrules *California Motor Transport*." *Id.* It reconciled the two cases by "reading them as applying to different situations":

> *Professional Real Estate Investors* provides a strict two-step analysis to assess whether a single action constitutes sham petitioning. This inquiry is essentially retrospective: If the suit turns out to have objective merit, the plaintiff can't proceed to inquire into subjective purposes, and the action is perforce not a sham.
>
> *California Motor Transport* deals with the case where the defendant is accused of bringing a whole series of legal proceedings . . . [It] recognized that the filing of a whole series of lawsuits and other legal

actions without regard to the merits has far more serious implications than filing a single action, and can serve as a very effective restraint on trade. When dealing with a series of lawsuits, the question is not whether any one of them has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival. The inquiry in such cases is prospective: Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?

*Id.* at 810–11. Unfortunately, cases in our circuit since *PREI* and *POSCO* have occasionally blurred the lines concerning which test should apply and when. For example, while cases originally referred to *PREI* as the test to apply when a "single" suit is at issue, subsequent cases have described *PREI* as the test to use when there is "a single sham lawsuit (or *a small number of such suits*)." *See, e.g.*, *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005) (emphasis added) (citing *Kottle*, 146 F.3d at 1060). Similarly, we have never defined what number constitutes a "series" of lawsuits in *POSCO*. *See, e.g.*, *Amarel v. Connell*, 102 F.3d 1494, 1519 (9th Cir. 1996), *as amended* (Jan. 15, 1997) ("[W]e do not attempt to define here the number of

legal proceedings needed to allege a 'series' or 'pattern' of litigation as required in [*POSCO*].").**[5]**

The district court handled this dilemma by surveying the case law applying *PREI* and *POSCO* and comparing it to the facts here. It noted, for example, that we declined to apply the *POSCO* exception in *Amarel*, 102 F.3d at 1519, because plaintiffs had "cite[d] only two lawsuits, not a 'series' or a 'pattern' of them." It also noted that *POSCO* itself involved significantly more lawsuits: twenty-nine, to be exact. *See POSCO*, 31 F.3d at 811. Noting that Defendants challenged four of Relevant's projects in CEQA proceedings, the district court concluded: "Four is much closer to two than twenty-nine, and so the *PREI* exception should apply."

Relevant argues that the district court "erred in presuming that [application of] the [*POSCO*] exception is a mere counting exercise." It asserts that the district court instead should have conducted a "holistic" analysis of Defendants' conduct. It cites *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc*., 690 F.2d 1240, 1256 (9th Cir. 1982) for the proposition that "it is not the number of claims which is controlling, but whether the evidence

---

[5] In some cases, it appears that it was easier for a panel to assume that the *POSCO* test applied and to reach the merits of that test, rather than determining which test applied at the outset. *Cf. Kaiser Found. Health Plan, Inc. v. Abbott Lab'ys, Inc.*, 552 F.3d 1033, 1046 (9th Cir. 2009) ("We need not decide whether Kaiser has waived its argument that the *California Motor Transport* test applies, for even under that test Kaiser loses its sham litigation claim."); *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 539 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 212 (2022) (assuming that *POSCO* applied where plaintiff alleged that defendant "filed or threatened to file dozens of cases," but affirming dismissal of complaint based on failure to plead success rate of lawsuits).

shows that the claim or claims filed constitute an abuse of process." *Id.* at n.25.

But there are several problems with Relevant's argument. First, even setting aside the fact that *Clipper* was decided before *PREI* and *POSCO*, that statement in *Clipper* is taken out of context. The panel made the statement not to suggest that one "action" can constitute numerous "actions" under *Noerr*, but rather to rebut defendants' assertion in that case that *Noerr-Pennington* protection applies *only* where a plaintiff has alleged more than one "sham." *Id.* at 1256–57. After reviewing Supreme Court case law, the *Clipper* court explained: "there is no reason to believe that the [Supreme] Court intended to extend the sham exception only to cases involving repetitive claims." *Id.* at 1256.

More to the point, Relevant's proposed alternative method of counting "proceedings" for purposes of the sham exceptions is not supported by case law. Relevant contends that the district court should have counted as separate "proceedings" certain discrete actions Defendants took while attempting to halt each of Relevant's four projects, such as "administrative objections and challenges." In particular, Relevant asserts that the district court should have counted as "proceedings" various objections and appeals, such as: "[an] Administrative appeal to the Planning and Land Use Management [] Committee," "Objections submitted to the City Council"; "[a] Petition for writ of mandamus filed in California Superior Court" and "[a] Comment letter to Community Redevelopment Agency of Los Angeles [] regarding proposed Owner Participation Agreement." When counting "proceedings" this way, Relevant asserts that the total number of proceedings is twenty, rather than four.

Relevant argues that *California Motor Transport* supports that we should count "comment letters," "objections" and "appeals" as discrete "proceedings" because the Supreme Court there acknowledged that the allegations "extended to rehearings and to reviews or appeals from agency or court decisions." 404 U.S. at 509. It also cites to *POSCO* for the proposition that the sham exception applies to "lawsuits *and other legal actions*," *POSCO*, 31 F.3d at 811 (emphasis added), implying that comment letters and objections would fall within the latter.

We are not persuaded. *POSCO* used the words "lawsuits," "actions" and "proceedings" interchangeably throughout the opinion. Although the panel did not define these terms, they are all words that refer to a larger concerted effort toward a remedy, rather than to individual, discrete actions taken within that effort, such as a letter sent to an administrative body. *See, e.g., Proceeding*, Black's Law Dictionary (11th ed. 2019) ("The regular and orderly progression of a lawsuit, *including all acts and events between the time of commencement and the entry of judgment*." (emphasis added)); *cf. Action at law*, Black's Law Dictionary (11th ed. 2019) ("A civil suit stating a legal cause of action and seeking only a legal remedy.").

Moreover, *California Motor Transport* is vague regarding whether it counted the above-quoted "rehearings and . . . reviews or appeals from agency or court decisions" as "proceedings" in the legal sense, or even what the "proceedings" at issue constituted (e.g., objection letters, comment letters, etc.). 404 U.S. at 509.[6] Notably, there is

---

[6] *California Motor Transport* was also an appeal from a motion to dismiss, rather than from a motion for summary judgment and therefore was subject to the laxer Fed. R. Civ. P. 12(b)(6) standard. *Id*.

some suggestion in *California Motor* that petitioners "use[d] administrative and judicial proceedings so as to deny [respondents] 'free and unlimited access' to those tribunals," such that "the machinery of the agencies and the courts was effectively closed to respondents." *Id*. at 511. Those kinds of allegations are not present here, where it appears that Relevant was able to litigate each challenge brought by Defendants in each applicable forum.

Ultimately, neither *California Motor Transport* nor *POSCO* supports counting each discrete litigation activity as a "proceeding" that together can constitute a "series of proceedings" for purposes of the *POSCO* test. Indeed, to the extent there is case law in our circuit defining what constitutes a "proceeding" for purposes of the *POSCO* exception, that case law is more harmful than helpful to Relevant. In *Manistee Town Center v. City of Glendale*, 227 F.3d 1090, 1094 (9th Cir. 2000), we explained that "[t]he sham exception is more easily applied to litigation, however, than it is to lobbying before executive or legislative bodies." And in *Kottle* we stated that "for purposes of the sham exception, executive entities are treated like judicial entities only to the extent that their actions are guided by enforceable standards subject to review." 146 F.3d at 1062. Thus, "[o]nly when administrative officials must follow rules is it meaningful to ask whether" the sham exception applies. *Id.*

As N&A notes, there are several alleged "proceedings" in this case that may not actually qualify as such for purposes of the *POSCO* exception because many of the activities are non-judicial. For example, N&A notes that "the permitting process is non-judicial." That fact removes a number of discretionary decisions out of Relevant's list of alleged "proceedings" it seeks to count to have the court apply the *POSCO* exception.

Admittedly, the district court's counting exercise might seem elementary. But a review of our precedent shows that it is not unreasonable. More importantly, Relevant's proposed counting method is both unsupported by case law and would inevitably result in line-drawing problems. For example, there is a reasonable argument that actions Defendants had to take to exhaust their administrative remedies should not be counted for purposes of the "sham" exception. Similarly, we struggle to see how lower courts hereafter would know whether to count a "letter" or "motion" as a "proceeding," or a dispositive motion as opposed to discovery motion as a "proceeding," just to name a few examples.

In establishing its "series" framework, *POSCO* relied on a fact pattern that involved twenty-nine lawsuits. *POSCO,* 31 F.3d at 810–11. Perhaps due to the rarity of that number, its infrequent application in our case law is a feature rather than a bug. Because this case only involves four actions resembling "lawsuits" in the traditional sense, we apply the *PREI* exception, rather than the *POSCO* exception to the facts of this case.

## B. Applying the *PREI* framework, the proceedings are not shams.

Under the *PREI* exception, a proceeding is a "sham" (1) "where the lawsuit is objectively baseless," and (2) where "the defendant's motive in bringing it was unlawful." *Sosa*, 437 F.3d at 938. "Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." *PREI*, 508 U.S. at 50.

The district court found that Defendants' actions were not objectively baseless as a matter of law. Relevant argues that the district court erred in reaching this conclusion

because there were disputes of material fact regarding that first prong of the *PREI* test.  But "[w]here, as here, there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide" objective baselessness "as a matter of law." *Id.* at 63; *Clipper*, 690 F.2d at 1254 ("These allegations fall within the sham exception as a matter of law.").  There are no factual (as opposed to legal) disputes about the underlying proceedings here, which are made up of "public legal filings and rulings," the content of which the parties do not dispute.  Therefore, the district court did not err by viewing the facts in the light most favorable to Relevant, but still deciding objective baselessness as a matter of law.

An action is objectively baseless when "no reasonable litigant could realistically expect success on the merits." *PREI*, 508 U.S. at 60.  As the *PREI* court explained, objective reasonableness is measured by the existence of "probable cause" as understood in traditional common law actions.  *Id.* at 62 ("The existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation.").  The threshold for what constitutes probable cause is low: it requires no more than a "reasonable belief" that there is "some chance" "that [a] claim may be held valid upon adjudication." *Id.* at 62–63; 65; *see also Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1008 (9th Cir. 2008) (holding that suit was not objectively baseless where it was "potentially meritorious").  While a winning lawsuit "is by definition . . . not a sham," the inverse is not true, and "a court must resist the understandable temptation to engage in *post hoc* reasoning by concluding" that an ultimately unsuccessful "action must have been unreasonable or

without foundation." *PREI*, 508 U.S. at 61 n.5. (internal quotation marks and citations omitted).

The district court concluded that the Thompson and Tommie actions were not objective baseless because "[t]he fact that Relevant settled both lawsuits is strong, if not conclusive, evidence" of that fact. Relevant argues that the district court's reliance on the settlements as evidence of probable cause was erroneous. It argues that when it comes to settlement, "[a] victim facing ruin will pay anything to avoid it—and where the threat of ruin comes from the litigation process, that means settlement." *Id.* at 60–61 (explaining that sham exception is concerned with the "use [of] the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon").

However, we have previously said that settlement indicates a lawsuit is not objectively baseless. In *Theme Promotions, Inc. v. News America Marketing FSI*, 546 F.3d at 1008, the court analyzed whether pre-suit letters from one party threatening litigation fell within the sham exception. The court noted that "the letters can be interpreted as threats to include the packaged goods companies in the ongoing litigation between [the parties]" and that, to the extent that interpretation was correct, "[t]he fact that this ongoing litigation settled suggests that the original suit was not objectively baseless." *Id.*

Relevant fails to address *Theme* in its briefing. But even if Relevant were correct that settlements are not indicative of a lack of objective baselessness, that does not mean that they *are* indicative of objective baselessness, either. A survey of other cases in our circuit suggests that to the extent settlements are relevant to the sham exception, they are only relevant as to the second prong of the *PREI* exception, i.e.,

whether the lawsuit was brought with an improper motive. *See, e.g.*, *B&G*, 29 F.4th at 541–42 (reversing district court's denial of leave to amend because new allegations could "support the subjective element [of the *PREI* exception], as they could support the inference that Defendants threatened and filed suit because they wanted to improperly pressure B&G into settling"); *see also Rock River Commc'ns, Inc. v. Universal Music Grp., Inc*., 745 F.3d 343, 353 (9th Cir. 2014) (holding that allegations that a party hoped to enforce its "rights through the threat of litigation rather than through actual litigation" could "satisfy[ ] the second criterion for the sham exception"); *Koziol*, 993 F.3d at 1172 n.12 (explaining that government could prove "improper motive" even if defendant filed threatened complaint because "the incongruity between his settlement demands and the complaint would be probative evidence of sham litigation").

Moreover, as the district court noted, the terms of the settlement here contained nonmonetary provisions that "a CEQA litigant might want, including provisions for noise reduction measures and a height reduction provision for the Thompson hotel." To the extent the Tommie/Thompson settlements are relevant, it would suggest that the underlying proceedings were not objectively baseless. Relevant responds that the terms of the settlement also required it "to forgo CEQA challenges to Defendants' own future developments, which is the antithesis of CEQA's animating purpose." But as we said in *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1048 (9th Cir. 2015), "a contractual commitment [and enforcement of it] to refrain from litigation does not violate the First Amendment; if it did, every settlement of a lawsuit would be unenforceable as a *Noerr–Pennington* violation."

The district court listed a few other reasons it thought the Thompson/Tommie actions were not objectively baseless. First, it noted that before trial was set to begin in the Thompson suit, "the Judge issued a tentative order denying the City's motion to augment the administrative record, which if granted 'would [have] support[ed] the City's argument that it disclosed certain design changes in the Project that are not found in the MND because they were added by the Real Party to the Project after the public comment period closed for the MND.'" Moreover, the district court noted that "two other petitions were filed against the project, which later settled." "One of those other petitioners was Lauren Farmer, who cited Sunset's objections and appeals to the City, and received a favorable remand and injunction from state court."

Relevant argues that neither of these facts is probative of probable cause because "no court ever ordered an EIR." But we agree with the district court that Relevant's framing of what constitutes a "success" under CEQA is too narrow.

CEQA's framework is unlike traditional litigation in that it involves a multi-tiered and multi-layered review process, rather than a win/loss binary. As described above, CEQA is multi-tiered in that "success" may be found in the form of something less than an EIR, such as an MND, which would tentatively allow a project to proceed subject to certain conditions. In addition, CEQA is multi-layered in the sense that it involves broad participation by the public, and requires the agency involved to review those comments.

Given that "[t]he overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary *consideration* to preventing environmental damage," Defendants' actions

cannot be said to be objectively baseless as they "succeeded" in having the agency consider the environmental impacts of Relevant's projects. *Save Our Big Trees*, 241 Cal. App. 4th at 704 (emphasis added) (citation omitted). As California courts have noted, this suggests that CEQA creates a "low threshold" for success. *Georgetown Pres. Soc'y v. County of El Dorado*, 30 Cal. App. 5th 358, 371 (2018). But if Relevant is concerned about the CEQA process being abused (as many persons and entities have claimed has occurred since its enactment), its recourse is to bring this to the attention of the state legislature and the governor, not to try to squash the process altogether in federal court.

For the same reason, the district court was correct to conclude that the Selma litigation was not objectively baseless. That conclusion is more obvious, as the state court reviewing that petition explicitly found CEQA violations and entered an order "for further proceedings and for the City to make specific findings to clarify the Project's baseline and resolve the issue of the impact on air quality."

Finally, the district court was correct to conclude that objections to the Schrader Project were not objectively baseless. The district court viewed the facts in the light most favorable to Relevant, whose narrative is that Defendants only halted their objections to the project once they found out that Relevant was no longer involved. But even if that is true, those facts are probative of improper motive, not objective baselessness. *See Koziol*, 993 F.3d at 1171, 1180–81 (noting that unlike the first prong, the second prong of *PREI* test involves a *subjective* standard, and that "Koziol's failure to file the threatened lawsuit supports the second prong of the sham exception (improper motive)") (emphasis added).

In sum, the district court did not err in concluding that Defendants' actions pursuant to CEQA were not objectively baseless. That is not surprising, given that we have previously said that courts should not "lightly conclude in any *Noerr–Pennington* case that the litigation in question is objectively baseless, as doing so would leave that action without the ordinary protections afforded by the First Amendment, a result we would reach only with great reluctance." *White v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000).

To be sure, Relevant raises several facts suggesting that Defendants had an improper purpose in bringing their actions. For example, Relevant asserts that when it met with Nourmand regarding certain objections, Nourmand responded, "you know the drill. It will take a check to make this go away." But we cannot review that evidence unless we first find that Defendants' actions were objectively baseless. *PREI*, 508 U.S. at 50 ("Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation."); *White*, 227 F.3d at 1232. As the Supreme Court instructed, "[w]hether applying *Noerr* as an antitrust doctrine or invoking it in other contexts, we have repeatedly reaffirmed that evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham." *PREI*, 508 U.S. at 59. That conclusion makes sense in light of the doctrine's ultimate purpose, which is to "overprotect" potentially baseless petitions to ensure that First Amendment rights are not chilled. *See Sosa*, 437 F.3d at 934 (referring to *Noerr-Pennington* protection as "breathing room protection"); *White*, 227 F.3d at 1233 ("This court has held that when an action involves the right to petition governmental bodies under Noerr–Pennington, it is necessary to apply a

heightened level of protection . . . to avoid 'a chilling effect on the exercise of this fundamental First Amendment right." (internal quotations omitted)).

Because the district court correctly held that Defendants' CEQA actions did not fall within the sham exception, we need not reach their other arguments to affirm the district court. These arguments are that "'litigation activity' can never be a 'predicate act' for purposes of civil RICO liability," and that Relevant has not alleged enough predicate acts to sustain a cause of action under RICO. Both of these questions involve unresolved issues of law, and we do not address them here. *See PDK Labs, Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("[T]he cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further.") (Roberts, J., concurring in part and concurring in the judgment).

## CONCLUSION

For the foregoing reasons, we AFFIRM the order of the district court.